## Case No. 2,522.

### CATLIN v. SPRINGFIELD FIRE INS. CO.

[1 Sumn. 434.][1]

Circuit Court, D. Massachusetts.   Oct. Term, 1833.

INSURANCE— CONDITIONS IN POLICY — CONSTRUCTION—NOTICE OF LOSS—SUFFICIENCY—WARRANTY AND REPRESENTATION — LEGAL DESIGN — WHEN IMPUTABLE — SEASONABLE OBJECTION TO EVIDENCE.

1. Among the conditions which were printed on the same sheet with a policy of insurance against fire, was one requiring, that "all persons insured, and sustaining loss or damage by fire, should forthwith give notice thereof to the company, and as soon after as possible deliver in a particular account of such loss or damage, signed with their own hands, and verified with their oath or affirmation. and also. if required, by their books of account and other proper vouchers." Held, that the particular account required by the above condition is a particular account of the articles lost or damaged, and does not refer to the manner and cause of the loss. See 2 Phil. Ins. 519.

[Cited in Perry v. Phoenix Assur. Co., 8 Fed. 646; Gauché v. London & L. Ins. Co., 10 Fed. 353.]

2. In stating a loss, it is sufficient to show it to have been occasioned by a peril within the policy, without negativing the exceptions of losses from design, invasion, public enemies, riots, &c., which are properly matters of defence. See 1 Phil. Ins. 634.

3. Conditions are to be construed strictly against those for whose benefit they are introduced, when they impose burdens on other parties.

[Cited in Ward v. New England Screw Co., Case No. 17,157; James v. Lycoming Ins. Co., Id. 7,182.]

4. The words in a policy against fire described the house, as "at present occupied as a dwelling-house, but to be occupied hereafter as a tavern, and privileged as such." Held, that this is not a warranty, that the house should, during the continuance of the risk, be constantly occupied as a tavern: but that it is. at farthest, a mere representation of the intention to occupy it as such, and a license or privilege granted by the underwriters, that it might be so occupied.

5. Where no objection was taken at the trial to the absence of evidence, which it might have been in the power of the party to supply, it is too late after the verdict to take it.

[Cited in Gauché v. London & L. Ins. Co., 10 Fed. 354.]

6. Where underwriters agree to make good any loss or damage "by fire originating in any cause, except design in the insured, invasion," &c., held, that the exception of losses by design admits all losses not by design; that, therefore, where the plaintiff negligently left the premises insured derelict, and intruders came and burnt them, without any co-operation or knowledge on the part of the plaintiff, it is a loss within the policy.

[Cited in Levi v. New Orleans Mut. Ins. Ass'n. Case No. 8.290.]

7. Legal design is imputable, where the consequences naturally flow from the act, and not merely follow it. They must be connected with it. as a cause, and not as an occasion.

At law. Assumpsit on a policy of insurance. Plea, the general issue. By the policy in the present case, dated on the 30th of

---

[1] [Reported by Hon. Charles Sumner.]

May. 1825, the defendants insured the plaintiff [Guy Catlin] for the space of six years from that date, "against loss or damage by fire to the amount of nine hundred dollars, on a dwelling-house, barn, and shed, situate, &c. in the town of Burlington, (Vermont,) owned by Lemuel Hayden and Harvey Hobart, of Burlington aforesaid, at present occupied by one Joel Rodgers, as a dwelling-house; but to be occupied hereafter as a tavern, and is privileged as such. Said buildings are made of wood, and are mortgaged to the said Guy Catlin to secure the payment of his debt, against the said Hayden and Hobart, of $1,146.20, and are more particularly described in a survey, dated May 30th, 1825, containing proposals of the insured, by him subscribed. On the dwelling-house $750, on the shed $100, and on the barn $50." And by the terms of the policy, the defendants agreed "to make good unto the assured any loss or damage, not exceeding in amount the sum insured, which shall or may happen to the property insured by fire originating in any cause, except design in the assured, invasion, public enemies, riots, civil commotion, or military or usurped power." And certain conditions and proposals annexed to the policy are agreed to be referred to, to explain the rights and obligations of the parties. The conditions and proposals thus alluded to are printed on the same sheet with the policy. They contain, among other things, the classification of certain risks, and rates of premium therefor; and a statement of the classification of goods into those not hazardous, those hazardous, and those extra-hazardous. And among those whose trades and occupations are deemed hazardous, are enumerated tavern-keepers. Among the conditions one (the eighth) is, that "all persons insured, and sustaining loss or damage by fire, are forthwith to give notice thereof to the company, and as soon after as possible to deliver in a particular account of such loss or damage, signed with their own hands, and verified with their oath or affirmation, and also, if required, by their books of account and other proper vouchers;" and also to "procure a certificate under the hand of a magistrate, notary public, or clergyman, most contiguous to the place of fire, and not concerned in the loss, or related to the insured or sufferers, that they are acquainted with the character and circumstances of the person or persons insured; and do know and verily believe he, she, or they really and by misfortune, and without fraud or evil practice, hath or have sustained by such fire loss and damage to the amount therein mentioned. And until such proofs, declarations, and certificates are produced, the loss shall not be deemed payable; also, if there be any fraud or false swearing, the claimant shall forfeit all claim by virtue of this policy."

The dwelling-house so insured was burnt down and totally destroyed on the evening of the 22d of February, 1830; and, on the 24th of the same month, the plaintiff addressed a letter to the defendants, informing them of the loss, which was duly received. The letter stated, that "the house was burned on the evening of the 22d instant, and totally destroyed." And it also contained a declaration, that the plaintiff had no other insurance, and had "sustained a loss full equal to the amount insured on the house. The shed and barn were not destroyed." And the plaintiff at the bottom of the letter, took a solemn oath before a justice of the peace, "that the statements therein made were true." The other preliminary proof of a certificate was furnished to the defendants, who declined paying the loss; and by a letter, dated on the 30th of March, 1830, in reply to that of the plaintiff, stated as a reason, that "the building was insured to be occupied. When burnt it had been a long time vacant, often deserted, derelict; and was destroyed by foul means. Had the house been occupied, as when insured, it is very clear the loss could not have occurred from the cause which destroyed it." No objection whatever was stated to the preliminary proofs of loss. At the trial the plaintiff had a verdict for $604.83.

C. G. Loring and Fay for the defendants, now moved for a new trial, which was opposed by Fletcher for the plaintiff.

STORY, Circuit Justice. A motion has been made and argued for a new trial upon various grounds. In the first place, that the court instructed the jury, that the letter of the plaintiff to the defendants, giving notice of the loss, was a sufficient compliance with the eighth condition above stated, requiring "a particular account of the loss or damage." The argument is, that the particular account here referred to should contain not only a statement of the amount of the loss, but of the manner and cause of the loss, verified by the oath of the party, so that it should appear, that it did not fall within any of the exceptions of the policy. But it seems to me very clear, that this is not the true interpretation or object of the clause. If we look at the policy, it will be seen, that the insurance company contemplate not only insurance upon houses, but upon goods and machinery. In cases of insurance upon goods, and in partial losses of all sorts, the particulars of the nature, quality and quantity of the goods, and of the damage or loss sustained, are most important to enable the company to decide on, and ascertain the damage or loss; and as these particulars are generally and almost exclusively within the knowledge of the assured, his oath or affirmation thereto, is required as preliminary proof. The underwriters rely on, and address the interrogatory to his conscience. But it surely could not have been expected, that the assured should, in all cases, swear as to the mode

and cause of the loss; for in many cases it would be impossible for him so to do, from the want of due knowledge or means of knowledge. He might know the fact of the loss by fire; but as to the precise mode in which the fire was kindled, he might be and ordinarily would be wholly ignorant. Surely, it could not have been required, that any person should swear to facts or causes of loss, which he could not know; and thus put his conscience in jeopardy, or lose his insurance, although the whole was a case of sheer misfortune, without the slightest suspicion of fraud.

But, if we examine the context, it seems to me that every doubt must vanish; for it may be truly said, in such a case, —"noscitur a sociis." The "particular account" is to be verified by the oath or affirmation of the assured, and "also, if required, by their books of account, and other proper vouchers." Now, this is all very natural, if the meaning be, as the court suppose it to be, a particular account of the articles lost or damaged; but it is wholly without meaning, if applied to the mode or cause of the loss or damage. No person could suppose, that the books of account of the party, or other proper vouchers, could or would furnish the slightest proof of such facts. And yet the argument is just as strong, applied to the case of such books and vouchers, as it is to the requisites of the oath or affirmation; for in each case they are required ad idem. And I cannot but think, that the company understood this clause, as the court does. For in their reply they placed their defence upon an entirely different ground, not suggesting this, as in all fairness they ought, if they meant to insist upon it. And then, again, as has been well observed at the bar, the oath of the party is not required, as an expurgatory oath, negativing fraud or design on the part of the assured. For these reliance is positively placed upon a more disinterested source, upon the certificate of some magistrate, notary, or clergyman, that the loss was real, and by misfortune, and without fraud or evil practice. As to negativing by oath the exceptions in the policy, it is nowhere required by any express stipulation in the conditions; nor can it be inferred from any reasonable presumption of intent. It is true, that it is said, that "if there be any fraud or false swearing, (in the alternative,) the claimant shall forfeit all claim by virtue of this policy." But this is mere matter of defence by the company, and constitutes no part of the preliminary proofs of the plaintiff. And, as to the exceptions of losses from design, invasion, public enemies, riots, &c., they constitute matter of defence, and are referrible to the trial, and are not to be negatived on oath in the preliminary proofs; because the plaintiff must at the trial prove a case primâ facie not within them. It might as well be contended, that the plaintiff was bound to state under oath every other fact, upon which his recovery should depend. The true answer to all these suggestions is, that the stipulation is not in the contract; and no court is authorized to add a single term to conditions in their own nature sufficiently onerous. Conditions are to be construed strictly against those, for whose benefit they are reserved, when they impose burdens on other parties. The language of the clause is, that the party is to "deliver a particular account of such loss or damage," in the alternative. He is to state an account of the loss, that is, of the thing or value lost; or of the damage, that is, of the amount of the injury sustained. But he is not required to state, how the loss happened, or the cause or occasion of it. It is also said, that the notice and statement of the loss must show it to be a loss within the risk of the policy; and that it is always so done in marine policies. Certainly, the loss must be shown by the notice to be by a risk within the policy; and it is so shown here, for the loss is stated to be by fire. But in the notice of a loss under a marine policy, no one ever supposed that it was necessary to state more than a loss by a peril insured against. Must the plaintiff go on, and negative all exceptions, express or implied by law, which constitute the defence of the other side? Must he state, that a loss by perils of the seas has been without any fraud, negligence, deviation, or non-compliance with warranties? Practically speaking, I have entire confidence that allegations of this sort have never hitherto been deemed essential or pertinent.

The next objection is, that the court instructed the jury, that the words in the policy, "at present occupied as a dwelling-house, but to be occupied hereafter as a tavern, and privileged as such," did not import on the part of the plaintiff a warranty, that they should be so occupied during the continuance of the risk. What the court did say to the jury on this point was, that these words did not constitute a warranty, that the house should, during the continuance of the risk be constantly occupied as a tavern; but that the language was, at farthest, a mere representation of the intention to occupy it as a tavern, and to secure for it the privileges of the policy as such. And I am, upon farther reflection, clearly of opinion, that the direction was right. We must interpret these instruments in a reasonable manner, from the nature and objects of the parties. Here the assured was the mortgagee of the house; and he is so described in the policy. In the ordinary course of things, he could not be presumed, as mortgagee, to intend to take possession of the property and occupy it as a tavern; and of course, if occupied as a tavern, it must be by or under the mortgagers. In point of fact, as the survey, made by the company's own agent, and on which the policy itself was underwritten, states, it "was to be occupied, in the course of two or three days by the

said Hayden and Hobart for the purpose of keeping a tavern." In the mouth of the mortgagee, then, if the language were to be treated as his, it could fairly be understood to import no more than a representation, that it was to be occupied as a tavern. And if so, then, as taverns are enumerated in the conditions of the company as among the hazardous risks, for which an extra premium is to be paid, it would follow, that the policy would be void for a fraudulent concealment, unless the fact were disclosed, and the house privileged as a tavern. But the language cannot in strictness be treated as the language of the mortgagee. It occurs in an instrument executed by the company, and purporting therefore to contain their engagement. It occurs in the descriptive part of that instrument. Of the property insured, the company say, that they insure the house now occupied "as a dwelling-house, and to be hereafter occupied as a tavern, and privileged as such." Privileged by whom? Clearly by the company,—to be used as a tavern. The company agree to take this hazardous risk, and permit the policy to attach, notwithstanding the house may be changed from a common dwelling-house to a tavern. They could have no motive for insisting, that the house should always be, as it is classed by the survey, in the sixth class of hazards. If it had continued to be occupied as a common dwelling-house, the risk would have been far less, while the premium would have remained the same. It was not, then, a warranty of the assured, that it should be at all times during the risk occupied as a tavern; but a license or privilege granted by the company, that it might be so occupied. The case is entirely different from that of a policy on a vessel to be engaged in the whale fisheries; for there the nature of the voyage ascertains and limits the language of the policy. Unless the vessel sails on a whaling voyage, the policy does not attach; and, if she engages during the voyage in other traffic, it is a deviation from the voyage. But, suppose a policy were on a coasting vessel generally for a twelvemonth, with liberty to engage in the whale fisheries; would that amount to a warranty, and tie up the policy to an employment solely in that trade? Or, suppose a policy on a vessel from Boston to Leghorn, and back, with the privilege of cruising as a letter of marque; would that amount to a warranty that she should so cruise? Certainly not in either case. The construction would be, not that the words restrained, but that they enlarged the general words of the policy. Let me put another case. Suppose a policy against fire, underwritten on the house of A in Boston, described as a dwelling-house, or as occupied as a dwelling-house; would the policy be void, if the house should cease for a time to have a tenant? Such a doctrine has never to my knowledge been asserted; nor should I deem it maintainable.

The interpretation put by the court upon the words of the policy, "privileged as such," seems now admitted by the counsel for the defendants to be the true one, although at the trial it was contended, that the meaning was, that the house was licensed by the municipal authorities, as a tavern; and it constituted one of the grounds in support of the motion for a new trial. That point is now abandoned.

Another objection is, that there was no evidence, that there ever was any intention to occupy the house as a tavern. It may have been so; but no objection was then taken to the absence of such evidence; and it is quite too late after a verdict to take it, when the deficiency might have been within the power of the party to supply. But in fact, if the ground of defence was misrepresentation, the onus probandi was on the defendants. The plaintiff was not bound to prove the representation, if any was made, to be true; but the defendants were to show, that it was false, and false in a point material to the risk.

The last objection is to a supposed instruction of the court on the point, what constitutes a loss by design within the meaning of the policy. I state it in this form, because the written motion does not accurately present the instruction of the court, or the language of the court, although it doubtless intended so to do. The line of argument in the defence at the trial did not impute to the plaintiff any direct or positive co-operation in the actual setting fire to the house, or any knowledge or connexion with the parties who did it. But it was to this effect, that if the plaintiff, by his negligence, and by leaving the house derelict, thereby exposed it to such destruction by mere trespassers, and was not unwilling, that it should be so destroyed, that such negligence and laches avoided the policy, and constituted a loss by design within the meaning of the policy. The court in commenting on this part of the case, said, that the case was as clear, and lay in as narrow a compass on this point, as any which had ever come before it. The language of the policy is, that the company will make good any loss or damage "by fire, originating in any cause, except design in the assured, invasion," &c. So that the company make themselves liable for losses by negligence, as well as by accident; for the exception of losses by design admits all losses not by design. I do not say, that the defendants would be liable for every loss occasioned by the gross personal negligence of the plaintiff; for it might under circumstances amount to a fraudulent loss. But the English decisions clearly are, that on policies against fire generally, losses by the negligence of tenants are within the risks taken. And it is still more clear, that losses by the negligence of tenants, or by the criminal wantonness, or misconduct of mere trespassers, or intruders, or felons, are within

the common policies against fire. But in the present policy there is no room for doubt on this point. The losses excepted are. not losses by design generally, but "losses by design of the assured." The case, then. is reduced to the consideration of what constitutes a loss by design in the assured, within the meaning of the policy. I say, that it is not a loss by the mere negligence or laches of the party, where he has left the property exposed to the peril, but has not co-operated directly or indirectly with those, who produced the loss. Design imports plan, scheme, intention, carried into effect. The loss, to be by design of the assured, in the sense of the policy, must be by incitement, connivance, or co-operation of the assured, directly or indirectly, with the persons, who were the agents in the act. It is not sufficient, that he is negligent in leaving the premises derelict, and thus exposing them to the wanton or criminal acts of intruders. Negligence is not design. We are here, as in other cases of insurance, to look, not to the remote cause, but to the proximate cause of the loss; "causa proxima, non remota spectatur." How can it be truly said, that the negligence of the plaintiff in this case was, in any just sense, the proximate cause of the loss, if he had no co-operation, knowledge, or part in the act? Unless, then, the jury can from the evidence clearly see. that the plaintiff was, not merely negligent, but was directly or indirectly connected with the act, I am of opinion, that it cannot be correctly deemed to be a loss by design of the assured. The defendants do not themselves impute to the plaintiff active co-operation, or connexion with the persons, who set the house on fire. On the contrary the argument supposes, that it was set on fire by mere transgressors or felons, who were utter strangers to him, and of whose designs he was ignorant. It imputes to him only negligence, and wishes or motives for the event, and undue exposure to the perils.

Such was in substance the direction to the jury. And now upon the farther argument, which has been had, I deliberately adhere to it. It appears to me, that the doctrine contended for in the defence is untenable and dangerous, and would take away all security under policies of this sort. It in reality attempts to engraft upon the words of the policy a new term, and to exempt the underwriters from all losses, which can be traced, however remotely, to the neglect or laches of the assured. If the latter were to leave open the front door of his house by night by gross negligence, and felons should enter and set it on fire, I do not perceive, how the loss upon the argument could be recoverable. It might then be said, as it is now said, that he had his motives, wishes, and expectations, though he was wholly ignorant of the ˙design of the felons. I cannot but think, that under such circumstances policies of this sort would hold out false lights and false securities to the assured; and would seduce them into the false confidence, that design meant something widely different, and contradistinguished, from negligence.

Legal design, it is said, is to be imputed to a party where the consequences naturally flow from the act. That is true; but then they must naturally flow from it, not merely follow it. They must be connected with it, as a cause, and not as an occasion. The act and the negligence must be knit together by an indissoluble bond. The law properly holds, that every man is presumed to intend, what are the natural consequences of his act. But it does not presume, that he intends every thing, which may possibly follow from his negligence, or be remotely occasioned thereby. The case of The Squib (Scott v. Shepherd), 2 W. Bl. S92, stands upon the very verge of the law, upon a sort of metaphysical subtilty; and, whether rightly or wrongly decided, it was decided, not upon mere negligence, but upon a direct and positive act, which gave rise to an action of trespass, as a mediate, if not an immediate act of force. In Percival v. Hickey, 18 Johns. 257. there was a direct and immediate act of force by running down the vessel of the party; and so the case of Guille v. Swan, 19 Johns. 381, was treated by the court.

But it is said, that the court did not leave the question to the jury, whether there was fraud on the part of the plaintiff, or such gross negligence as was presumptive of fraud. No such ground is suggested in the written motion for a new trial; and of course it cannot, according to the rules of this court, be now taken notice of. But I may say, that, if not put to the jury. it was because the point was not distinctly put by the defence for the consideration of the jury. The court certainly is not to be expected to supply matters of defence. which the counsel do not choose to insist upon at the trial. Upon the whole, my judgment˙ is, that the motion for a new trial ought to be overruled; and it is accordingly overruled.