PERKINS, Administratrix, *v.* THE NEW YORK CENTRAL RAILROAD COMPANY.

A railroad corporation cannot, by contract, exempt itself from liability to a passenger for damage resulting from its own willful misconduct or recklessness which is equivalent thereto.

But in respect to a gratuitous passenger it may contract for exemption from liability for any degree of negligence in its servants, other than

the board of directors or managers who represent the corporation itself, for all general purposes.

Whether the corporation is liable to a free passenger, so contracting, for negligence in the construction of the road, as upon an implied guaranty of its security, when the misconduct from which the injury resulted was that of a trackmaster who, knowingly, used rotten material in building a bridge, there being no evidence that it was known to the superior managing officers. *Quære.*

APPEAL from the Supreme Court. Upon the trial, these facts appeared: On the 10th of May, 1858, the plaintiff's husband, William H. Perkins, applied to one of the directors of the defendants' Company for a free pass on the defendants' railroad from Rochester to Albany and back, and received a pass in the words and figures following:

"NEW YORK CENTRAL RAILROAD COMPANY,
"*Rochester, May* 10, 1858.

"Pass W. H. Perkins, Esq. (transp't of Smith, Perkins & Co.), as per conditions on the other side of this ticket, to Albany and back, 1858, unless otherwise ordered.

"J. GOULD, *Director.*"

On the reverse was printed:

"NOTICE.—The person accepting this free ticket assumes all risk of accidents, and expressly agrees that the Company shall not be liable, under any circumstances, whether of negligence by their agents or otherwise, for any injury to the person, or for any loss or injury to the property, of the passenger using this ticket. If presented by any other person than the individual named therein, the conductor will take up this ticket. This pass is not to be presented or used by the holder to procure a pass over any other road."

Perkins' attention was called to the conditions on the back of the ticket when he received it. He started from Rochester, in a train of the defendants' railroad, on the morning of the 11th of May, and was killed in consequence of the breaking down of a bridge over the Sauquoit creek. The train was an

ordinary passenger train, with four coaches, well filled with passengers, several of whom, besides Perkins, were killed. Another train, going west, was passing the bridge at the same time, and also broke through said bridge.

The plaintiff gave evidence tending to prove that the bridge was built of unsuitable materials, and that some of the timbers were rotten. It appeared that the bridge was built in 1855, under the direction of William Evarts, trackmaster of the defendants upon that portion of their road which included the Sauquoit creek; that the span was forty feet; that it had six chords, five of which were of water-elm. Proof was given that this wood was unfit for bridges; that the elm was rotten when put into the bridge, so much so that auger chips pulverized when rubbed in the hands. It further appeared that the attention of Evarts had been called to the condition of this timber, and its rottenness was shown to him when the work-men were preparing it for use, and that he persisted in putting it in, saying it was the best they had and it must go in. There was no evidence given by the defendants on these points.

The defendants showed that Perkins was riding on the free pass aforesaid when the accident happened.

Upon these facts the judge charged that, "if Perkins was riding upon the free pass, he was riding upon the conditions annexed to it. But, notwithstanding such conditions, if the negligence of the defendants was gross and culpable; if it was of such a character that it would subject the party to prosecution for fraud or crime; then it does not come within those conditions. In other words, that, if this ticket is in the nature of a contract, the parties to the contract did not contemplate such cases as are fraudulent or criminal in their character.

"That the statute provides that when culpable negligence causes the death of a party, such negligence amounts to a felony. If you shall find that negligence in the construction of the bridge, or in suffering it to remain in that condition, was gross and culpable in its character amounting to a fraud or crime; the defendant is liable notwithstanding the conditions of the pass, and you are to determine from the evidence

what the character of this negligence was. You will look at this case exactly as if Evarts, the trackmaster, was the owner of the road, and if there was such a degree of negligence as to amount to gross or culpable negligence on his part, such as would subject him to indictment for manslaughter had he been the owner of the road; then the defendants are liable because his negligence is their negligence. The statute, in regard to such negligence, is this: [reading the statute definitive of manslaughter in the 4th degree for culpable negligence.] If the negligence of the trackmaster came up to this, so that he would be indictable, the defendants are liable although Mr. Perkins was riding on a free pass and notwithstanding its conditions."

The several propositions in this charge were duly excepted to.

The counsel for the defendant presented several requests to charge, which were also refused and exceptions duly taken.

The court, with the consent of the counsel for the respective parties, directed the jury, at the time of rendering their verdict, to answer the following question:

Was Mr. Perkins, on his trip at the time of the accident, riding on the free pass delivered to him by Gen. Gould?

The jury found a verdict for the plaintiff for $5,000, and answered the foregoing question in the affirmative. The judgment upon the verdict was affirmed at general term in the seventh district, and the defendant appealed to this court.

*Sidney T. Fairchild*, for the appellant.

*George F. Danforth*, for the respondent.

E. D. SMITH, J. The death of the intestate was caused and occasioned under circumstances which, if he had merely sustained a bodily injury from which he had recovered, would unquestionably have entitled him to maintain an action for such injury, unless he had debarred himself from such action by accepting and riding upon a free ticket.

The plaintiff's right of action, under the statutes of 1847 and 1849, depends upon the same circumstances. Unless Mr.

Perkins, if he had survived the injury which resulted in his death, could have maintained an action for such injury, his widow and next of kin clearly cannot maintain this action. The statutes of 1847 and 1849 give to the personal representatives of a deceased person whose death is caused by the wrongful act, neglect or default of any person or corporation, an action to recover a fair and just compensation not exceeding $5,000, with reference to the pecuniary injury resulting from such death. This is a new and original cause of action given by, and depending wholly upon, the statute. The damages recoverable in such case depends upon entirely different principles from those recoverable by the person injured in case death had not ensued from the injury. In such case, the person injured would only recover compensatory damages personal to himself, including expenses incurred and losses sustained in consequence of the injury. (*Lincoln* v. *The Saratoga and Schenectady Railroad Company*, 23 Wend., 425.)

But, in the case where death results from the injury, the pecuniary value of the life of the person killed, to the next of kin, is the measure of damages, to the extent of five thousand dollars. (*Whitford* v. *The Panama R. R. Co.*, 23 N. Y., 467; *Blake* v. *The Midland Railway Co.*, 10 Eng. L. & Eq., 443.)

Assuming that the pass on which the deceased was riding is to be regarded as a free ticket, and that the defendants were carrying the deceased gratuitously, independently of the question whether Mr. Perkins expressly agreed to assume all risk of accidents upon the trip, the defendants would be clearly liable for any injury sustained by him if he had survived the same; and in this action, on the same ground, would be liable also to the plaintiff.

Having received the deceased into their cars, they would, in this view, be bound to carry him safely. They were and are not bound to carry him or any person gratuitously; but, undertaking to carry him, they must do it carefully, as with other passengers. This was settled, in principle, in the case of *Cogys* v. *Bernard* (2 Ld. Raym., 909). In that case the defendant undertook to take up several hogsheads of brandy,

then in a certain cellar, and lay them down again in a certain other cellar, and did the work so carelessly that one of the casks was stayed and a great quantity of the brandy lost. The defendant was a mere private person, and it was claimed that, as he was not a common porter, and was acting gratuitously, he was not liable. But, upon very full argument, and after much consideration, it was held that, having assumed and undertaken to do the work, he was bound to do it carefully, and was liable for any injury resulting from his negligence.

This precise question was decided in this court in *Nolton* v. *Western Railroad Company* (15 N. Y., 444), and in the Supreme Court of the United States in *The Philadelphia and Reading Railroad Co.* v. *Derby* (14 How., 468;) in *Steamboat New World* v. *King* (16 id., 477); and in *Gillinwater* v. *The Madison and Indianapolis Railroad Company* (5 Ind. [Porter], 340).

The next inquiry is, whether the ticket upon which Mr. Perkins was riding was, in legal effect, anything more than a notice. It is well settled in this State that common carriers cannot limit their responsibility by a notice. This has been deemed settled law since the decision of the cases of *Hollister* v. *Nowlen* (19 Wend., 234), and *Cole* v. *Goodwin* (id., 251). But this ticket can hardly be regarded as a mere notice. If Mr. Perkins had applied to purchase a ticket in the ordinary way, or had paid for his passage like passengers generally, and had received this ticket for his money and as his authority to get into and ride in the defendants' cars, the ticket should probably be regarded as a mere receipt and voucher for his fare, and could not, I think, be regarded as an agreement on his part to take the risk of accidents; for the defendants could not, in such case, by their own act, enforce or impose any such agreement upon the passenger, or compel him to relinquish his legal right to be safely transported. The carrier clearly cannot limit his responsibility by his own act. (6 How. U. S., 382.)

But he did not apply to purchase a ticket. He did not pay his passage, or contemplate riding in the defendants' cars like ordinary passengers, paying full fare.

Applying for a pass, or free ticket; taking it and having it in his possession some six or eight hours before the starting of the train in which he was to go; and having his attention expressly called to its terms, taken in connection with the fact, found by the jury, that he was, at the time of the accident, actually riding on this ticket, if not conclusive against him as a legal presumption, would at least be evidence that he assented to the terms indorsed upon the ticket, from which a jury would be authorized to imply such assent; and, as the circuit judge was not asked to submit any such question to the jury, I think the plaintiff is hardly at liberty to deny that there was, in fact, such an agreement as the defendants claim.

Assuming, then, that Perkins agreed to take "all the risks of accidents, and expressly agreed that the defendants should not be liable under any circumstances, whether of negligence by their agents or otherwise, for any injury to his person"—for such are the terms of the ticket—the question remains, what is the extent and force of such agreement. Upon its face, it is clearly sufficiently comprehensive to embrace every description of accident, casualty or risk attending railroad travel. But it must obviously be subject to some limitation and qualification. It ought not to be considered as applying to such risks as could not have been within the intent and contemplation of the parties, and cannot apply to such as are not within the legitimate compass of contract upon principles of public policy.

The learned judge who tried this case at the circuit charged the jury that, "while, if the deceased was riding upon the pass, he was riding upon the conditions annexed to the pass, yet, notwithstanding the conditions thus particularly expressed, if the negligence of the defendants was gross and culpable; if it was of such a character that it would subject the party to a prosecution for fraud or crime; then it does not come within these conditions." In other words, that, if the ticket is in its nature a contract, the parties to the contract did not contemplate such cases of negligence as are fraudulent or criminal in their character.

Perkins *v.* The New York Central Railroad Company.

The rule of exception from the apparent scope and purview of the contract, asserted in this part of the charge, I think cannot be sustained. It states that fraudulent and criminal negligence is not within the scope of the contract. This would clearly be so, if the defendant were a natural person, and was stipulating in respect merely to his personal acts. And if it were not so, fraud vitiates all contracts; and no person will be allowed to stipulate for crime. If the defendants were private persons, who could commit crime and could be indicted and convicted under the statute of murder or manslaughter for killing Mr. Perkins, most certainly such crime would not be within the purview of this contract.

It is quite clear that Mr. Perkins never intended to agree, or the defendants to stipulate, that they, by their servants or agents, might kill him. Such was not the bargain. No one will pretend that the right to commit murder or suicide could be embraced in this or any contract. Like all other agreements, this contract must be construed in the light of the existing facts and circumstances at the time it was made, and not derive its construction from subsequent events. Parties, in making a contract, must be held to contemplate all the ordinary and possible incidents, accidents or contingencies which may attend its execution; and such accidents and contingencies must be deemed within the purview of the contract, not as accidents expected, but as accidents possible.

What, then, did these parties mean by this contract? The cardinal rule of interpretation is, what was the intent of the contracting parties at the time of making the contract? In the light of this rule, what are the facts? Perkins applied to the defendants' director for a free pass. A free pass means, the privilege of riding over the defendants' railroad without payment of the customary fare. The defendants are a railroad corporation, exercising the rights and subject to the responsibilities of common carriers, and liable, in a civil action, in this capacity, for all injuries to persons or property transported by them resulting from the negligence or unskillfulness of their agents or servants. The business of the defendants is all

necessarily performed by agents and servants, and the defend-
ants are necessarily obliged to employ a large number of per-
sons as such agents and servants, some of whom will be more
or less careless or negligent, notwithstanding and in despite of
the utmost care, diligence and caution in their employment.
The defendants are transporting persons and passengers by the
powerful agency of steam; and when accidents did occur, they
were liable to be attended, more or less, with very serious con-
sequences. This the parties both well knew, and they also
well knew that railroad accidents were of frequent occurrence;
that railroad travel was subject constantly to perils resulting
from the carelessness and negligence of engineers, conductors,
baggagemen, brakemen, switch-tenders, and others; that trains
were frequently thrown off the track or came in collision, and
were subject to a variety of accidents and casualties against
which no human prudence or skill in the employment of agents
could entirely guard; and that all such accidents involve una-
voidably, more or less, loss of life or limb or bodily injury, and
other disastrous consequences. With perfect knowledge of
these facts, Mr. Perkins asked for and accepted the free pass,
upon the express condition that he should " assume all risk of
accidents" and expressly agreed " that the Company shall not be
liable under any circumstances, whether by the negligence of
the defendants' agents or otherwise, for any injury to the per-
son," &c. Such is the bargain. It can mean nothing else
than that Perkins will take for himself the risk of all acci-
dents and injuries to his person attending his contemplated
trip in the defendants' cars from Rochester to Albany, so far
as such accidents and injuries might result from the negligence
of the defendants' agents and servants. The defendants, in
view of the accidents, attended with much pecuniary loss,
resulting constantly from the negligence of some of their
agents, proposed to carry Mr. Perkins without charge to Al-
bany upon condition that he would take for himself the risks
attending the trip.

The question between the parties was simply which should
take the risk of such accidents as might occur in consequence

of the negligence of some of the defendants' many agents. Without an agreement exempting and absolving them from all liability in respect to such accidents, and the injuries resulting therefrom, the defendants would be legally responsible for such injuries. Mr. Perkins assumes the risk for himself. He becomes his own insurer. He absolves the defendants in advance from all liability "for any injury to his person" from such negligence. It was a fair insurable risk, and Perkins agreed to assume it for himself. If this be the contract, upon what principle it can be claimed that it does not embrace the accidents which may result from the gross negligence of the defendants' agents, I cannot conceive. The contract makes no exception in respect to degree of negligence. It embraces all degrees. It uses the term negligence in its general generic sense. To hold that it does not embrace gross negligence is to interpolate into it a qualification not made by the parties, and which tends materially to impair and nullify its force, for the parties well knew that accidents were liable to result from the gross negligence of defendants' agents, as well as from inferior negligence. The contract related to the acts of third persons, acting as agents, of the defendants. Perkins agreed to take his risk in respect to the negligence of such third persons. He took it entirely. If the agents were guilty of criminal negligence, which is only another name for gross negligence when it causes death or injury to life or limb, the agent himself is punishable criminally for such negligence. The principal never could be so punished. His civil responsibility therefore is discharged by the contract. There is no reason why the defendants should be responsible for the gross negligence of their agents, more than for slight negligence. To the principle asserted in the charge, I have tacitly assented in two cases, in *Bissel* v. *The New York Central Railroad Company* (29 Barb., 602), and in this case at general term which follows, and was decided upon the authority of that case. But I am satisfied upon reflection that it is essentially unsound.

The portion of the charge referred to, may perhaps embrace a denial of the right of the defendants to relieve themselves

by contract from liability, for the gross negligence of their agents. The charge impliedly admits that the contract was valid as a protection to the defendants as against all accidents resulting from the degrees of negligence, below gross negligence.

A party who claims exemption from liability, for the negligence of his servants or agents, must undoubtedly base his claim upon the express words of his contract. It will not be presumed in his favor. In the case of *The New Jersey Steam Navigation Company* v. *The Merchants' Bank* (6 How. U. S., 383), the contract did not embrace, in terms, the negligence of the defendant's agents, and the court held, that it could not be regarded as stipulating for such negligence. Judge NELSON, who gave the opinion of the majority of the court, says:—"If it is competent at all, for a carrier to stipulate, for the gross negligence of himself, and his servants or agents, in the transportation of goods, it should be required to be done, at least in terms that could leave no doubt as to the meaning of the parties."

The case of *Wells* v. *Same Defendant* (in 4 Seld.), holds the doctrine, that negligence may be stipulated against, in respect to agents, but will not be deemed included in general words of exception, unless .expressly mentioned. Judge GARDINER, says: "A man may contract against fraud or felony committed by those in his employment." The words of the agreement in that case, upon which the question arose, were that the canal boat be taken in tow, &c., "*at the risk of the master and owners* thereof." These words it was held, and was properly held, did not include gross negligence.

But where negligence, as in this case, is expressly mentioned and stipulated against in the contract, I think the claim to make an exemption, to the force and effect of the contract based upon a distinction in the degrees of negligence, unsound and untenable.

I think with Lord DENMAN, who, in *Hinton* v. *Dibbin* (2 Q. B., 661), said: It may well be doubted whether between gross negligence and negligence merely, any intelligible distinction

exists. Judge CURTIS (in 16 How. U. S., 474), also says, it may be doubted whether the term "slight, ordinary and gross negligence, can be usefully applied in practice."

The difficulty of defining gross negligence, and the intrinsic uncertainty pertaining to the question as one of law, and the other impracticability of establishing any precise rule on the subject, renders it unsafe to base any legal decision on distinctions of the degrees of negligence. Certainly before cases are made to turn by the verdict of juries, upon any such distinction, the judges should be able to define, with some precision, what they mean by gross negligence, slight negligence and ordinary negligence. It will be seen on examining the many cases reported, where the question has arisen, that this has been found utterly impracticable by the judges, when called upon to instruct juries on the question, and also when called on to declare the law more carefully in bank.

Negligence is essentially always a question of fact, and every case depends necessarily upon its own particular circumstances. What is negligent in a given case, may easily be affirmed by a jury; but in what degree the negligence consists, in any scale of classification of degrees of negligence, is not so easily determined — will ordinarily be a matter of pure speculation and of no practical consequence.

Upon the ground taken in that part of the charge referred to, that, if the negligence of the defendants' agent, Evarts, was gross and culpable, it was not embraced within the contract, and the defendants were liable in this action for the consequences resulting from such negligence, the learned judge, I think, erred; and the verdict cannot be sustained.

SELDEN, Ch. J., DENIO, DAVIES, ALLEN and GOULD, Js., concurred in this conclusion; and the court ordered a new trial. SELDEN, Ch. J., referred, for the reasons of his judgment, to the following opinion, delivered by him in another case, argued at the same term, in which the court failed to agree, and a reärgument was ordered:

SELDEN, Ch. J.   The statute upon which this action is founded makes the defendants liable, only in cases where they would have been liable "if death had not ensued." (Sess. Laws, 1847, ch. 450.)   The question, therefore, is precisely the same as if the deceased had received an injury, from which he had recovered, and had himself brought an action for damages.   At the time of the accident, which caused his death, he was traveling from Buffalo to Albany, in one of the defendants' cars attached to a cattle train, and had in charge two car-loads of cattle belonging to himself and another.   The written agreement under which the cattle was transported, contained the following clause:   "And it is further agreed, between the parties hereto, that the persons riding free to take charge of the stock, do so at their own risk of personal injury, *from whatever cause.*"   The deceased also received, upon entering into the contract, a ticket headed "New York Central Railroad, cattle dealer's ticket, on passenger train," upon the back of which was indorsed the following:   "The owner of stock receiving this ticket assumes all risk of accidents, and expressly agrees that the company shall not be liable under any circumstances, whether of negligence by their agents, or otherwise, for any injury to the person or for any loss or injury to the stock of said owner, shipped by stock or freight trains."

As the deceased at the time of the accident was not upon the passenger but on the stock train, he is to be deemed perhaps as having been traveling under the written agreement, rather than upon the ticket.   As however the delivery of the ticket was simultaneous with the execution of the agreement, and both related to the same transaction, either may be referred to, to aid in interpreting the other.   I do not see, however, that the construction of both together would be in any respect different from that of either taken by itself.

The case presents two questions.   We are called upon, first, to interpret the agreement, and to see what risks are embraced by its terms; secondly, to determine how far a railroad company, engaged in carrying passengers, may, by special contract, limit its liability for injuries resulting from the want of

due care. Although the responsibility of carriers of passengers differs essentially from that of common carriers of goods, the latter being substantially insured against every loss not arising from inevitable accident, while the former are only liable for injuries resulting from negligence, there is nevertheless a strong resemblance between the two kinds of employment; and some light may be obtained in cases like the present, from the decisions in regard to carriers of goods.

The very high responsibilities of common carriers being imposed upon grounds of public policy, the courts, both in this country and in England, have shown some reluctance to permit those responsibilities to be limited by any agreement between the parties. Hence, upon all questions of construction arising upon such agreements, they have uniformly inclined to preserve as much of the original liability of the carrier as possible. Still, it is only when there is something vague, uncertain, or equivocal in the terms of the agreement, that this disposition has been manifested. Whenever the language is clear and explicit, they have never refused to interpret it according to its plain and literal import.

Thus, in the case of *Lyon* v. *Wells* (5 East., 428), where a carrier by water had given notice "that he would not be answerable for *any* damage unless occasioned by want of ordinary care in the master or crew of the vessel," the court said, that notwithstanding the words "any damage," it was absurd to suppose that the carrier meant to make himself responsible for the negligence of the master and crew, and not for his own personal negligence; and therefore held, that he was not exempt from liability for a loss arising from his not having provided a sufficient vessel. But in the case of *Chippendale* v. *The Lancashire and Yorkshire Railway Company* (7 Law & Eq. R., 395), where the terms upon which the defendants were to transport the plaintiff's cattle, were stated in a ticket as follows: "This ticket is given subject to the owners undertaking all risks of conveyance *whatever*, as the company will not be responsible for any injury or damage, *howsoever, caused,* occurring to live stock of any description traveling upon the

Lancashire and Yorkshire Railway, or in their vehicles;" it was held that the company was not liable for an injury to the cattle arising from a defective track. The question was, as to the construction of the contract. COLERIDGE, J., speaking of the case of *Lyon* v. *Wells, supra,* which had been cited, and which was also purely a case of construction, said: "The court reasoned from the particular exception in the case of want of ordinary care in the master and crew, that it must be intended that want of ordinary care in the owner was also excepted; and that it was a want of ordinary care on his part in not providing a proper vessel. Now, *the words here do not leave us open to adopt any such ground of construction as in that case.*"

So, in the subsequent case of *Carr* v. *The Same Company* (14 Law & Eq. R., 340), where the plaintiff's horse, transported under an agreement identical in terms with that in the case of Chippendale, had been injured through the gross negligence of the defendants, and the question raised, was whether the agreement should be so construed as to exempt the defendants from liability for injuries arising from gross negligence, the court held that the company was not responsible. In reply to the argument of the plaintiff's counsel, PARKE, B., said: "we ought not to fritter away the meaning of contracts merely for the purpose of making men careful."

The terms of the contract in the present case are, I think, equivalent to those used in these two English cases. The persons traveling upon the train to take charge of the stock, were to do so "at their own risk of personal injury from *whatever cause.*" Our language affords no words more comprehensive than these. Every possible injury to the person is clearly embraced in the terms used, and there is nothing in the other portions of the contract, as there was in the case of *Lyon* v. *Wells,* to render it improbable that the parties intended to give to these terms their full signification. Where the language of a contract is clear and unequivocal, courts are bound to interpret it according to its plain and ordinary import. The ticket delivered at the time of the execution of

the written agreement, to which if necessary we are at liberty to refer, presents no obstacle to the construction of that agreement which I have suggested, but on the contrary strengthens and confirms it. Its terms are different, but equally comprehensive. I have no hesitation therefore, in holding, that the agreement in this case should be construed to exempt the company from every species of liability which the law will permit them to contract against, including injuries from negligence or fault of any kind, whether imputable to the company directly, or only through its subordinate agents.

Having thus disposed of the question of construction, it remains to inquire how far parties engaged in the business of transporting passengers, have a legal right to discharge themselves from responsibility for injuries to the persons of such passengers. There is clearly some limitation to this right. It will be generally conceded that an individual so engaged cannot by any agreement, exempt himself from liability for any injury resulting from any willful or wanton misconduct of his own. That a party should be permitted to contract, that he may with impunity inflict wanton injury upon others, is repugnant to every sentiment of justice and propriety. No one seems ever to have contended for such a proposition, and hence there are no decisions upon the point; although law writers and judges have incidentally expressed their opinions in regard to it. Sir William Jones speaking of the obligations of a bailee, says: "As an agreement that a man may safely be dishonest, is repugnant to decency and morality, and as no man shall be presumed to bind himself against irresistible force, it is a just rule that every bailee is responsible for *fraud*, even though the contrary be stipulated." (Jones on Bail., 11.)

Judge STORY also lays down the same rule. He says: "In respect to cases of loss by fraud, there is a salutary principle, belonging both to our own law and the civil law. It is: that the bailee can never protect himself against responsibility for losses occasioned by *his own fraud;* nay, not even by a contract with the bailee that he shall not be responsible for such losses. For the law will not tolerate such an indecency and

immorality as that a man shall contract to be safely dishonest."
The same principle is asserted by GARDINER, J., in *Wells* v.
*The Steam Navigation Company* (4 Seld., 375), and by WELLES,
J., in *Parsons* v. *Monteath* (13 Barb. S. C. R., 353). It is not
confined to common carriers and other bailees, but from its
nature must be general in its application.

But the question arises, how far does the principle extend.
Are parties precluded from protecting themselves by contract
from the consequences of their own negligence, or want of care?
This, certainly, cannot be claimed as a general rule in respect to
every degree of negligence. The restriction is limited in the
passages quoted from Jones and Story to the frauds of the bailee.
This corresponds with the principles applied to policies of
insurance against fire. Although the terms of such policies
are frequently general, embracing every loss by fire, from what-
ever cause, still, if the loss was produced by the fraud of the
insured the other party is not liable. It is otherwise, however,
when the loss occurs from negligence even of the insured
himself, provided the terms of the policy are such as clearly to
embrace such a loss. In the case of *Catlin* v. *The Springfield
Insurance Company* (1 Sumn., 434), the policy bound the
company to make good any loss or damage " by fire originating
*in any cause,* except design in the insured," &c. Judge STORY
held that the company was liable for the loss which had occurred,
although it appeared that the insured had himself negligently
left the premises vacant, and that intruders had come in and
burned them, but without his co-operation or knowledge.

So in the case of *Thurtell* v. *Beaumont* (1 Bing., 339), which
also was an action upon a policy against loss by fire, the defence
set up was that the plaintiff had willfully set fire to the
premises, or had caused them to be set fire to. The judge
charged the jury that to sustain the defence, the crime of
willfully setting fire to the premises must be brought home to
the plaintiff by evidence that would warrant them in finding
him guilty of that offence; of course holding that showing
that the fire was caused by the negligence of the plaintiff was
no defence; and on motion for a new trial this charge was

sustained. These cases show that there is no general rule which prohibits a party from contending for immunity from the consequences of his own negligence.

It does not follow, however, that such contracts can be made to cover every species of negligence of which the contending party may himself be guilty. There is a degree of recklessness which can scarcely be distinguished from a wanton or willful disregard of duty. It is equally reprehensible, and its consequences are in general held to be the same. It is to this degree of negligence that I understand Judge WELLES as referring, in *Parsons* v. *Monteath, supra,* when he says, "A contract which should excuse the carrier from liability for damage or loss arising from his own fraud or gross negligence would not be enforced." The same idea is suggested by Judge STORY in *Catlin* v. *The Springfield Insurance Company,* already referred to, where he says, "I do not say that the defendants would be liable for every loss occasioned by the gross personal negligence of the plaintiff, for it might, under circumstances, amount to a fraudulent loss."

The principle therefore is, that parties cannot contract that they themselves may with impunity be guilty of willful misconduct, or of that degree of recklessness which is its equivalent. To this extent, no doubt, carriers of passengers are precluded from absolving themselves by contract from their responsibilities. But the rule has no application to contracts exempting them from liability for the acts of third persons. There is some difficulty in applying these principles to railroad companies on account of the artificial nature of corporations. As they can act only through agents, it may with about equal plausibility be said, on the one hand, that every act of their authorized agents, and on the other, that no such act is to be regarded as a direct act of the corporation. But a distinction is no doubt to be made, between the directors or managing officers of a corporation and its subordinate agents. As the former exercise all the powers of the corporation and are its only direct medium of communication with outside parties, they must, in respect to all its external relations, be considered

as identical with the corporation itself. No contract, therefore, can exempt a railroad company from liability for the willful or wanton misconduct or gross recklessness of its directors; but the rule extends to no other officer or agent of the company.

The supreme court seems to have supposed, that the verdict in this case, could be sustained upon the ground that the negligence which resulted in the death of Bissell, was to be attributed to the directors of the company, and was of such a degree, that the company could not protect itself from liability for its consequences by any contract. But it is evidently impossible to sustain the judgment upon that ground: because the jury was not required to pass upon the case in that aspect. The judge charged the jury, in substance, that if they were satisfied the death of Bissell was caused by gross negligence of the defendants, or their switch-tender, the plaintiff was entitled to a verdict, and to this the plaintiff's counsel excepted. It is impossible to sustain this charge, upon the basis of the particular rule under consideration, for two reasons—First, the terms 'gross negligence' admit of great latitude of application, and do not alone adequately describe that degree of negligence which is necessary to bring the case within the rule in question. The negligence must be of that kind which is equivalent to a willful or wanton neglect of duty, and so the jury should in such cases be instructed; and secondly, no degree of negligence on the part of the switchtender would make a case for the application of the rule. It follows that the judgment in this case cannot be sustained upon the mere ground that parties are not permitted to protect themselves by contract from liability for their own personal misconduct.

But other grounds are taken which it is necessary to consider. The counsel for the respondent very justly likens this case to that of a common carrier of goods, and seems to think it not entirely settled that such carriers can by contract limit their common-law liability; or at least can exempt themselves from liability for the gross negligence of their servants or agents. This question, however, is too clear to require discussion. It has long been settled in England, that common

carriers may by special contract regulate and control the extent of their responsibility. (Story on Bail., § 549; Angell on Carriers, § 220, et seq.) There can be no doubt that this right in England is held to extend to every degree of negligence however gross, and, as I apprehend, even to the fraudulent or willful misconduct of the servant or agent of the carrier. (*Leeson* v. *Holt*, 1 Stark., 186.) In this case which was an action against common carriers for negligence, in which the defence set up was, that there was a special contract exempting the carrier from liability, Lord ELLEN-BOROUGH said, "Under the terms of the present notice, if a servant of the carriers had in the most *willful and wanton manner destroyed* the furniture entrusted to them, the principals would not have been liable." That this is the rule in England there is no doubt. There are now various statutes on the subject in that country, commencing with that of 1 Geo. IV, but none which impair the force of this rule of the common law. In this state it was held in one or two cases, that common carriers were precluded upon grounds of public policy from limiting their responsibility by special contract. But these cases have been overruled, and the doctrine of the English courts is now the doctrine of this court. (*Wells* v. *Steam Navigation Co.*, 4 Seld., 375; *Dorr* v. *New Jersey Steam Navigation Co.*, 1 Kern., 485.)

Conceding, however, that common carriers of goods, may by special contract protect themselves from liability for the gross negligence or even frauds of their servants or agents, it is nevertheless contended that carriers of passengers cannot, by any contract, avoid responsibility for the negligence of their servants, when such negligence amounts to a crime. Our statutes provide "that every man who, by his culpable negligence causes the death of another, although without intent to kill, is guilty of manslaughter."

This position appears to involve some confusion of ideas. What connection there is between the liability of the servant to punishment for his crime, and the liability of the master in a civil action for the consequences of his servant's negli-

gence, it is difficult to perceive. For the crime, the servant alone is responsible. The master neither participates in his guilt, nor is in the least degree involved in responsibility for it. The imposition of punishment for the public offence, and the enforcement of liability for the private injury, do not rest upon the same reasons, and bear no relation whatever to each other; nor can the latter with propriety be in the slightest degree influenced by the former. The idea suggested seems to have for its basis a blending of the principle already considered, which prevents a person from exempting himself by contract from responsibility for his own personal fraud, and that which holds a master liable for the negligence or fraud of his servant. But what these two principles have to do with each other, it is impossible to perceive. There is no doubt, I think, that the true rule is that stated by GARDINER, J., in *Wells* v. *Steam Navigation Company, supra*, when he says: " Although the law will not suffer a man to claim immunity by contract against his own fraud, I know of no reason why this may not be done in reference to fraud or *felony* committed by those in his employment." It is impossible therefore to uphold this judgment upon the ground that the negligence of the switch-tender is made a crime by statute.

It is however suggested, although not made a point upon the argument, that, on account of the very serious consequences and great risk to life which attends accidents upon railroads, public policy forbids that railroad companies should be permitted to exempt themselves by contract from those responsibilities for the safety of their passengers which the law devolves upon them.

This position calls upon the court to introduce a principle entirely new. It is not pretended that there is any precedent for such a rule. Passengers have been carried by stage-coaches for centuries without the application of any such restriction upon the natural right of individuals to take care of their own interests, and to provide for their own security. No such principle has ever been applied to transportation by vessels or by steamboats. It may be said that traveling by

railroad is more hazardous than by other modes. Statistics would seem to prove the contrary : but this is immaterial. The question is, whether the principles of the common law which have always permitted men to manage their own affairs and to make their own contracts, provided they involve nothing immoral or illegal, are to be adhered to. Are the courts to interpose in a matter of mere private contract for the protection of individuals against the consequences of their own improvidence ?

It may be urged that such contracts of exemption, if permitted, will tend to a relaxation of vigilance on the part of railroad companies, and that this affects the security of large numbers of persons, and is therefore a matter of public interest. But we have no reason to suppose that the practice ever has been carried to such an extent as to produce any appreciable effect in this way; and there is little danger that it ever will be. It is confined to the comparatively few cases in which persons travel gratuitously. If, however, it should ever prove productive of evil consequences, which I do not apprehend, it would, I think, be better to leave the remedy to the legislature than for the courts to break in upon the settled rules of law in respect to the right of individuals to bind themselves by contract. To establish the principle contended for would be an act of pure judicial legislation, and would, in my judgment, be an unwarrantable assumption of power. It would not be the mere application of a principle already established to a new class of cases — which is within the province of the courts, but the introduction of a new principle which has neither precedent nor analogy to support it. To this I am opposed. The judgment should, I think, be reversed, and there should be a new trial, with costs, to abide the event.

SMITH, J., in the Perkins case, was for affirmance, upon grounds thus stated by him :

SMITH, J. (*continuando* and dissenting.) The verdict in this case can, I think, be sustained, upon other grounds.

Though the circuit judge presented the case to the jury as though the negligence of Evarts was not embraced in the contract, if gross and culpable, and that such negligence, if found by them, fixed the liability of the defendants, yet such negligence was discussed and considered in reference to the true point upon which, I think, the defendants' liability depended. The judge charged the jury that, "if they should find that negligence in the construction of the bridge, or in suffering it to remain in that condition, was gross and culpable in its character, amounting to a fraud or crime (meaning fraud or crime in Evarts), then the defendants were liable, notwithstanding the conditions of the pass." In this portion of the charge, the circuit judge presented substantially the true issue to the jury. Though this negligence was the immediate and personal fault or crime of Evarts, the trackmaster, still it was, in contemplation of law, the negligence of his principals, the defendants, as the proprietors of the road.

The common carrier always guarantees the safety of the vehicle in which the passenger is transported. The law implies a contract, in all cases, on the part of the carrier, that the vessel, or coach, or vehicle, whatever it may be, is sufficient for the business in which it is employed. (*Camden Co. v. Burke*, 13 Wend., 628; 5 East., 428; Story on Bail., §§ 509, 592.) The railroad is part of the machinery for the carriage of passengers, as much as the stage-coach or ship. (*Curtis v. Rochester and Syracuse R. R. Co.*, 18 N. Y., 536.) The negligence of Evarts in constructing the bridge over the Sauquoit of unsound, unsafe and improper materials, and the suffering of such bridge, thus negligently constructed, to remain in use, was the negligence of the defendants, as owners and proprietors of the railroad, and was a breach of this implied warranty.

This implied warranty is not embraced within the terms, scope, or intent of the contract or agreement made with Mr. Perkins, indorsed on the pass received by him. It is like the warranty of title, never necessarily embraced in terms in the contract of sale of goods or in the warranty of their sound-

ness, goodness or other qualities. As well might a man, who was selling property not his own, reserve the right to cheat the vendee in such sale, as for a carrier to reserve the right to keep his road unsafe or to send the passenger by an unsafe conveyance.

The defendants are carriers of persons and passengers over their own railroad by the powerful agency of steam. They are bound to construct their railroad track with all possible care, and are bound to keep it in a safe and proper condition. They are bound to exercise the utmost skill and care in the preparation and management of their road, and of all the means of conveyance used thereon. The defendants, as common carriers of passengers, impliedly warrant and guarantee to every person who gets into one of their cars to be transported over their road, or any point or part thereof, that such road is landworthy, that its track, bridges and all its structures are made and constructed in the most skillful manner and of suitable and proper materials, and are, in all respects, kept and maintained in a sound and safe condition, that their locomotives and cars and all their appurtenances are constructed with the utmost care and skill and are kept in sound and proper order, and also, that they have provided for the care and management of the trains on their said road, careful, skillful, competent and sober engineers, conductors, switch-tenders, and all other necessary agents. (Story on Bail., § 593; *Curtis* v. *Rochester and Syracuse R. R. Co.*, 18 N. Y., 537; Angell on Carrier, §§ 78, 338; *Hegeman* v. *Western R. R. Co.*, 3 Kern., 22.) But if the contract had contained an express exemption to the defendants from all responsibility by reason of the unsafe condition of their road and its bridges, locomotives and cars, such contract would be utterly void as against public policy. It would fall within the condemnation of the rule that no one shall stipulate for his own fraud or personal negligence.

The negligence, therefore, which the jury have found in respect to the construction and maintenance of said bridge was, in fact and legal effect, the negligence of the defendants as principals and proprietors of said railroad, and for which

the judge properly held that they were liable. The verdict was therefore right, upon this discrimination between the negligence of the principal and that of the agents, and the real issue, upon which the defendants' liability depends, was necessarily and fairly tried.

The contract in this case, I think, is limited to that class of agents concerned in running and taking care of the train which carried the deceased, embracing the conductor, engineer and ordinary attendants of a train, such as brakesmen, baggagemen and switch-tenders, whose duty it was to watch for such trains.

The distinction I make between those acts of negligence which should be deemed the negligence of the principal and that of the agent, is recognized in numerous cases. It applies particularly in that class of cases where the principal has been held liable to one agent for the negligence of another agent of a common superior. In such cases it is quite generally conceded that the principal will be liable if he employs an unskillful or incompetent agent in any department of his business, or uses defective or improper machinery. This court so held in the case of *Keegan* v. *The Western Railroad Company;* (and see 6 Barb., 243; Story on Agency, § 321; *Farwell* v. *B. & W. R. R. Co.,* 4 Metc., 49; *Coon* v. *Syracuse R. R. Co.,* 1 Seld., 495.)

When the principal is a natural person, the distinction between the acts of the principal and those of the agent is quite apparent and universally recognized. The difficulty in cases like the present arises from the fact that the defendant is a corporation, and all its operations are necessarily carried on through the personal instrumentality of numerous agents, exercising different offices and performing different and distinct functions and duties. But this circumstance should not give the defendants any rights or immunities in the transactions of business superior to those possessed by natural persons. Courts must look behind the artificial body which their charter creates, to the real principals—the stockholders of the defendants' corporation. They run the defendants' railroad,

and carry on, thereon and therewith, the business of carriers of persons and property. They have a corporate name, in which they contract, and by which they sue and in which they are sued; but, aside from the privileges conferred by their charter, they are really liable in such corporate name, through their property invested in its stock and employed in its business, to the same extent as if they were members of a joint-stock company, or simply partners. The rule of their liability and responsibility in the transaction of business in and through the corporate name they employ, is precisely the same which would attach to them as natural persons. If a single person run the defendants' railroad, or many persons in the character of copartners, the single owner or each of the partners would be responsible as a principal for all its liabilities for negligence or otherwise, and could not exempt himself by contract from such liability, except for acts of subordinate agents. The officers and all the superior class of agents who direct and control the operations of the defendants' railroad; who set the machine in motion; who employ its numerous engineers, conductors and other agents; who purchase its locomotives and cars, and direct the construction and repair of its road, bridges and other structures; all, I conceive, stand in the place of the corporation, as respects the public and third persons, precisely as though they were, respectively, members of a copartnership owning and controlling said railroad. This class of agents do the work of their principal, and their acts and negligences should be deemed those of the principal.

The contract, too, in this case, I think, was prospective, and related only to such negligence as might transpire in connection with the running of the particular train on which Mr. Perkins was to go. It did not embrace, I think, such past negligence as was involved in the construction of a railroad bridge some three or four years previously, or in the maintenance of such bridge.

For these reasons, I think, the judgment should be affirmed. But a majority of my brethren think otherwise, and are of the opinion that the case having been tried and disposed of at the

circuit and at the general term upon different and erroneous principles, the verdict cannot be retained upon the views herein expressed, but the case should go back to the circuit for re-trial.

The judgment must, therefore, be reversed, and a new trial be granted, with costs, to abide the event.

Judgment reversed, and new trial ordered.