IDA C. HAZZARD and Others, Plaintiffs, *v.* THE CHASE NATIONAL BANK OF THE CITY OF NEW YORK, Defendant.

Supreme Court, Special Term, New York County, April 14, 1936.

58

*Levy, Kraus & Leman [Jack Lewis Kraus, 2d, Millard H. Ellison, Joel R. Parker* and *William Katz* of counsel], for the plaintiffs.

*Milbank, Tweed, Hope & Webb [William D. Embree* and *A. Donald MacKinnon* of counsel], for the defendant.

ROSENMAN, J. The defendant bank, by succession to the Equitable Trust Company of New York, became the trustee of an indenture of trust executed January 31, 1928, as of January 1, 1928. The indenture was executed by National Electric Power Company, and covered an issue of $10,000,000 of its debentures. There were deposited with the trustee, at the time of the execution of the trust indenture, as security for the debentures provided for thereunder, 85,000 shares of the common stock of New England Public Service Company, 155,989 shares of the common stock of Penn Central Light and Power Company, 29,993 shares of the common stock of Michigan Electric Power Company, and 44,986 shares of the common stock of Ohio Electric Power Company.

The trust indenture permitted substitution by the obligor of other securities for the securities originally deposited, under certain conditions to be hereinafter discussed. On December 18, 1931, the obligor made an application to the defendant as trustee to permit the substitution of 276,522 shares of class A common stock of National Public Service Corporation, and 444,868 shares of class B common stock of National Public Service Corporation for the aforesaid stock of Penn Central Light and Power Company, Michigan Electric Power Company and Ohio Electric Power Company. On December 21, 1931, the defendant bank granted the application; and on that date delivered to the obligor the shares of Penn Central Light and Power Company, Michigan Electric Power Company and Ohio Electric Power Company which it held, and received in place thereof the aforesaid shares of class A and class B common stock of the National Public Service Corporation.

These plaintiffs are some of the owners and holders of the debentures of National Electric Power Company which were covered by the trust indenture. They complain of this substitution. They allege that the defendant bank was guilty of bad faith and gross negligence in permitting it. In the month

of July, 1932, National Public Service Corporation went into bankruptcy, so that the substituted stock became concededly worthless. On the other hand, the stock which the defendant permitted the obligor to withdraw is still concededly of substantial value. The obligor of the debentures, National Electric Power Company, also became bankrupt; so that the plaintiffs can look only to the security under the indenture for payment of their bonds. The plaintiffs by this action seek to compel the trustee to replace the valuable securities surrendered, or, in lieu thereof, to pay the damages caused to the holders of the $10,000,000 of bonds as a result of this substitution.

The prospectus on which these debentures were sold states that they are secured by the deposit of the enumerated stocks "under and subject to the provisions of the indenture." The debentures themselves refer to the indenture for "a description of the property pledged" and "the nature and extent of the security." Although these plaintiffs did not examine the trust indenture, and although it is a matter of common knowledge that purchasers of debentures of this type secured by a trust mortgage seldom, if ever, examine the terms of the trust indenture, it is well settled that debenture holders are legally bound by the terms of the indenture. (*Benton* v. *Safe Deposit Bank of Pottsville*, 255 N. Y. 260.) Its terms must, therefore, be considered.

The indenture is a printed document of 101 pages. The provisions of it which are important in the consideration of this controversy are as follows:

Article IX, section 5 thereof, provides that "At any time and from time to time * * * the company shall be entitled to withdraw, and the trustee shall deliver to the company * * * any shares of stock (of a subsidiary company or other corporation), bonds or other securities deposited with the trustee hereunder, upon written application of the company therefor, provided that as shown by an earning certificate (as herein defined) the amount of earnings applicable to debenture interest (as herein defined) from the * * * stocks, bonds or other securities remaining on deposit with the trustee hereunder, and from any * * * stocks, bonds or other securities deposited with the trustee hereunder simultaneously with such withdrawal, for a period of 12 consecutive calendar months within the 15 calendar months immediately preceding the date of the application for such withdrawal or release, shall have been at least equivalent to twice the interest requirements for a period of one year upon all bonds outstanding * * * hereunder on the date of such application."

In other words, the company was given the right to withdraw any securities under the trust indenture and to substitute therefor other securities, providing only that the earnings, applicable to paying the interest under the indenture from all of the securities remaining on deposit with the trustee after the substitution, for a period of twelve consecutive calendar months within the fifteen calendar months immediately preceding the application for substitution, shall have been at least twice the interest requirements for a period of one year. In view of the fact that the interest requirements for one year of the $10,000,000 of debentures was $500,000, it was necessary to present an earnings certificate of the securities remaining on deposit after the substitution, showing earnings of at least $1,000,000 for any one year within the preceding fifteen calendar months prior to December 18, 1931.

The form and content of the earnings certificate referred to in the above clause is prescribed in article I, section 4, of the indenture. The actual substitution of securities was handled by Mr. Buckley, a trust officer of the defendant. The draft of the application, together with the earnings certificate, was submitted to him on December eighteenth. After checking these papers with the terms of the indenture, he sent them over to the counsel for the bank for such correction as the counsel might deem to be necessary. Counsel made a few unimportant verbal corrections, had a conference with counsel for the obligor on December twenty-first, and on that day the application was approved in final form by counsel. On the same day the securities were substituted. The trust officer testified as to his own ignorance of the affairs of National Public Service Corporation and National Electric Power Company. He did not know that the latter was a debtor of the bank or that the officers of the Insull system were debtors. He stated that the substitution was handled by him alone, supervised only as to legal details by counsel for the bank. He testified that, so far as he knew, no other officer of the bank was concerned with the substitution or had anything to do with it.

Although the plaintiffs have urged that it is highly improbable that a transaction of so large an amount could have been handled exclusively by a subordinate officer in the trust department, receiving a salary of $7,200, without some direction or order from a superior officer, nevertheless there is no evidence on which the court can make an inference of fact that the substitution was ordered or directed by any superior officer in the bank.

Article XV of the trust indenture specifies the terms and conditions under which the trustee accepts the trust.

Section 5 of such article reads as follows:

" Section 5. The Trustee may execute any of the trusts or powers hereof and perform any duty hereunder, either itself or by or through its attorneys, agents or employees, and it shall not be answerable or accountable for any act, default, neglect, or misconduct of any such attorneys, agents or employees, if reasonable care has been exercised in the appointment and retention thereof, nor shall the Trustee be otherwise answerable or accountable under any circumstances whatsoever, except for its own gross negligence or bad faith."

Sections 9 and 10 of the indenture read in part as follows:

" Section 9. The Trustee shall be protected in acting upon any notice, resolution, request, consent, order, certificate, report, opinion, bond, or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties. The Trustee may consult with counsel and the opinion of such counsel shall be full and complete authorization and protection in respect of any action taken or suffered by it hereunder in good faith and in accordance with the opinion of such counsel and such action so taken or suffered shall be conclusive and binding upon the Company and on all holders of bonds issued under this Indenture.   *   *   *

" Section 10. Upon any application   *   *   *   for the execution of any release, or upon any other application to the Trustee hereunder, the resolutions, certificates, statements, opinions, reports and orders required by any of the provisions of this Indenture to be delivered to the Trustee as a condition of the granting of such application may be received by the Trustee as conclusive evidence of any fact or matter therein set forth and shall be full warrant, authority and protection to the Trustee in acting on the faith thereof, not only in respect of the facts but also in respect of the opinions therein set forth; and before granting any such application the Trustee shall not be bound to make any further investigation into the matters stated in any such resolution, certificate, statement, opinion, report or order,   *   *   *; but it may in its discretion make any such independent inquiry or investigation as it may see fit. If the Trustee shall determine   *   *   * to make such further inquiry, it shall be entitled to examine the books and records of the Company, either itself or by agent or attorney; and unless satisfied, with or without such examination, of the truth and accuracy of the matters stated in such resolutions, certificate, statement, opinion, report or order, it shall be under no obligation to grant the application.   *   *   *   The reasonable expense of every such examination shall be paid by the Company."

The obligor, National Electric Power Company, was one of the major holding companies near the top of the so-called Insull system, and dominated the Insull empire in the eastern part of the United States. It owned practically all of the shares of stock of the National Public Service Corporation. Above it was the Middle West Utilities Company which in turn was controlled by two other companies, viz., Corporation Securities Company of Chicago and Insull Utilities Investments, Inc., which were in turn controlled by the Insull family. The National Public Service Corporation was likewise a holding company, and did not itself operate any utilities. It had its own senior issue of stock and its own funded indebtedness and separate creditors. Below the National Public Service Corporation there were a veritable maze of sub-holding companies and sub-subholding and operating companies. The Ohio Electric Power Company, the Penn Central Light and Power Company and the Michigan Electric Power Company were all operating companies, and the stock of each of them, before the substitution, was held by the National Electric Power Company directly. The management and directorship of the various holding companies were the same; so that in effect the Insulls dominated the entire system, transferring and shifting loans, collateral, debits and credits from one company to another virtually at will.

The defendant, while acting as trustee for these bondholders, was also a large creditor of the obligor — in fact its largest single creditor. It had loaned considerable sums of money from time to time to the National Electric Power Company without collateral. This loan was increased to $6,000,000 on June 19, 1931, and at about that time the defendant received collateral therefor. It is obvious that the defendant, as a creditor of the obligor, occupied a position inconsistent with its role as a trustee under the indenture. In addition, the principal officers of the obligor and of the other companies of the system were heavily indebted to the defendant upon obligations which were past due on the date of the substitution, and some of which were under-collateralized and uncollectible. For example, on that date Martin Insull, who was the vice-chairman and executive director of National Electric Power Company, owed the defendant $4,250,000. Ziegler, the vice-president, and Reid, the president of National Electric Power Company, both of whom were directors, were similarly indebted to the Chase National Bank in large amounts. The total of loans to the Insull group was $12,520,000. The collateral for all of these loans were securities of some part of the so-called Insull system. Corporation Securities Company, the ultimate stock-

holder of the obligor, owed the defendant $500,000 which it could not pay. The ramifications of the various holding companies, subholding companies, sub-subholding companies, involved in this system need not be here described in detail. The records of the bank indicate that the bank itself considered the loans to the various companies and corporate officers in the Insull system, all in the general category of Insull loans.

For its services as trustee under the indenture the bank received an annual fee of $1,100 or $1,200.

The Chase National Bank is a very large banking and trust institution, divided into many distinct departments. It has some forty or fifty vice-presidents. Its trust department is apparently operated as a separate unit of the bank. The business of this department was confined to trust matters, and is carried on at 11 Broad street in New York city. The banking department is located at 18 Pine street in New York city.

Mr. Makepeace was a vice-president of the defendant, connected exclusively with its banking department and not with its trust department. He was not conversant with the affairs of the trust department, and his duties had nothing to do with the trust department. His duties, so far as the bank is concerned, were confined to supervision of the mercantile branch of the banking department and to the making of loans at the head office.

Makepeace was at the same time a director of the National Electric Power Company and a director of the National Public Service Corporation. He was also a member of the executive committee of National Public Service Corporation. He had been a member of these boards during all the time he had been an officer of the Equitable Trust Company, the original trustee, and of the defendant Chase National Bank, the substituted trustee.

The evidence is in conflict as to whether or not Makepeace's service on the boards of the National Electric Power Company and National Public Service Corporation was in the capacity of an agent of the bank or not. Although it does not appear that he was specifically requested to go on these boards by the defendant, I find as a fact that he purported to represent the defendant's interests where it was necessary or advisable to do so while on these boards. The inference from the evidence is that the defendant considered Makepeace to a great extent the liaison between the National Electric Power Company and the National Public Service Corporation on the one hand, and the defendant on the other. To the degree that it was necessary, and as occasion required, Makepeace was the guardian of the bank's interests as a creditor of the two companies.

This case required about six weeks for trial. About 3,300 pages of testimony were taken and over 500 exhibits were admitted. Various inferences are drawn by the parties in their briefs from this mass of evidence. Not all of the conflicting contentions can be discussed in this opinion. Only those most clearly affecting the legal principles involved can be considered.

The plaintiffs contend:

1. That the defendant was guilty of bad faith in permitting the substitution. They urge that the purpose of the defendant was to enable the obligor to use the withdrawn collateral for the purpose of meeting the debenture interest requirements of $250,000 coming due ten days later on January 1, 1932; that by thus preventing an otherwise inevitable default in the payment of this interest, the obligor was to be kept alive for another six months, during which time the defendant would be enabled to collect or protect its loans to the various parts of the Insull system, and the various individual officers thereof.

2. That if the bank was not guilty of actual bad faith, it was guilty of gross negligence in permitting the substitution for the following reasons:

(a) That the securities deposited in substitution of the securities withdrawn were valueless; that any investigation by competent investigators would have shown from an examination of the books that such stock was valueless; that apart from any investigation, Makepeace, as a director of the National Electric Power Company and the National Electric Public Service Corporation, actually knew that the substituted stock was valueless; and that the bank's files themselves indicated that such stock was highly speculative.

(b) That the earnings certificate which was furnished on December 21, 1931, as a basis for the substitution, was, in fact, false; that an investigation by competent accountants of the books of the National Electric Power Company and National Public Service Corporation would have shown that it was false; and that, apart from any investigation, Makepeace, as a director of Public Service Corporation and National Electric Power Company, knew that it was false.

The defendant contends:

1. That the defendant was not guilty of bad faith; that the securities were withdrawn to be used in connection with an expansion program and geographical realignment of properties in the Insull system, involving the exchange of various operating companies with other utility systems by purchase and sale; that they were not withdrawn for the purposes alleged by the plaintiff.

2. That the defendant was under no duty to make any investigation as to the value of the stock of the National Public Service Corporation; that " value " was not the criterion set up for the substitution but that " earnings " were the sole test.

3. That the defendant was under no duty to make an investigation as to the truth or falsity of the earnings certificate presented.

4. That if an investigation had been made it would have disclosed that the substituted stock did have value, and that the earnings certificate was substantially correct.

5. That the knowledge of Makepeace as to the affairs of the National Public Service Corporation and National Electric Power Company is not imputable to the bank; but that even if such knowledge be held to be imputable, Makepeace had no knowledge that the substituted stock was valueless or that the earnings certificate was false.

With respect to the first contention of the plaintiffs, I find that the plaintiffs have not sustained the burden of proving that the trustee sought to obtain profit for itself at the expense of its debenture holders by its action in allowing the substitution, or that it was actuated in any way by bad faith. The purpose of the withdrawal of these securities, so far as the bank's knowledge has been proven, was in furtherance of an expansion policy and of a geographical realignment of operating and holding companies. While there exist many suspicions circumstances to indicate that the chief executive officers of the National Electric Power Company and the National Public Service Corporation, and the other Insull top holding companies, were not acting in good faith in many of the transactions testified to on this trial, there is nothing to show that the bank had any knowledge of any insincerity in these alleged expansion and realignment policies. It appears that Makepeace was acquainted with them as a director of the two companies, and there is no showing from which an inference can be drawn that he did not, in fact, believe them to be *bona fide.*

With respect to the second contention of the plaintiffs as to " gross negligence," the meaning of such phrase as used in the exculpatory clause of this indenture must be determined. The defendant has been expressly exempted from all kinds of negligence save only gross. Efforts have been made by our courts and text writers to define the term. Difficulty arises when an attempt is made to differentiate between degrees of negligence. Circumstances make it incumbent upon persons, in some situations, to use utmost care and caution. Other situations require only the exercise of casual or incidental care. In the former class the failure to exercise such extreme degree of care as the circumstances require may

be negligence equally as gross as the omission to use the casual care in the latter class.

Can it be said with precision that an act of negligence is ordinary, or slight, or gross?

" It may be doubted if these terms can be usefully applied in practice. Their meaning is not fixed, or capable of being so. One degree, thus described, not only may be confounded with another, but it is quite impracticable exactly to distinguish them. Their significance necessarily varies according to circumstances, to whose influence the courts have been forced to yield, until there are so many real exceptions that the rules themselves can scarcely be said to have a general operation." (*Steamboat New World* v. *King,* 16 How. [57 U. S.] 469, 474.)

" This division of negligence into the degrees indicated is clearly fallacious. It overlooks the important fact that the term ' negligence ' refers only to that legal delinquency which results wherever a man fails to exhibit the care which he ought to exhibit, whether it be slight, ordinary, or great. If a man is bound to use slight diligence and fails to do so he is legally delinquent and is guilty of actionable negligence. It is the same where he is bound to use ordinary, or great, care and fails to do so." (Street, " The Foundations of Legal Liability," vol. I, p. 99. See, also, " Shearman & Redfield on the Law of Negligence " [6th ed.], vol. 1, chap. III; Salmond, " Torts " [7th ed.], p. 29; Wharton Negligence [2d ed.], § 44 *et seq.*)

" I confess myself careless, ignorant and indifferent upon this whole subject of the degrees of negligence. It is plain that such refinements can have no useful place in the practical administration of justice. Negligence cannot be divided into three compartments by mathematical lines." (Thompson, " Commentaries on the Law of Negligence " vol. I [2d ed.], § 18. See, also, *Wilson* v. *Brett,* 11 Mees. & W. 113, wherein Baron ROLFE defined gross negligence as being plain negligence to which there has been added a " vituperative epithet.")

When we turn to expression by our courts, we find varying conclusions. As early as 1862, in an action for death of a passenger who was traveling on the defendant railroad on a free pass exempting the carrier from negligence under any circumstances, the Court of Appeals said:

" The difficulty of defining gross negligence, and the intrinsic uncertainty pertaining to the question as one of law, and the other impracticability of establishing any precise rule on the subject, renders it unsafe to base any legal decision on distinctions of the degrees of negligence. Certainly before cases are made to turn

by the verdict of juries, upon any such distinction, the judges should be able to define, with some precision, what they mean by gross negligence, slight negligence and ordinary negligence. It will be seen on examining the many cases reported, where the question has arisen, that this has been found utterly impracticable by the judges, when called upon to instruct juries on the question, and also when called on to declare the law more carefully in bank.

" Negligence is essentially always a question of fact, and every case depends necessarily upon its own particular circumstances. What is negligent in a given case, may easily be affirmed by a jury; but in what degree the negligence consists, in any scale of classification of degrees of negligence, is not so easily determined — will ordinarily be a matter of pure speculation and of no practical consequence." (*Perkins* v. *N. Y. Central R. R. Co.*, 24 N. Y. 196, 207.)

Yet only six years later, in a case involving damage to merchandise being transported by the defendant railroad, the same court recognized the distinction as one " which is often found of but little practical importance when dealt with by the jury on the trial of a cause, but one which the courts are bound to regard." (*French* v. *Buffalo, N. Y. & Erie R. R. Co.*, 4 Keyes, 108, 114.)

This distinction in degrees of negligence, such as it is, has been observed for many years. " The distinction between ' slight ' and ' reasonable ' care and between ' ordinary ' negligence and ' gross ' negligence is oftentimes shadowy and unsatisfactory. But the courts, however fortunate or otherwise they may have been in expressing that distinction, do recognize that it exists." (*Dalton* v. *Hamilton Hotel Operating Co., Inc.*, 242 N. Y. 481, 487 [1926].) That case involved the loss of trunks left by a guest with the defendant hotel. The court in that case referred to the definition laid down in *Weld* v. *Postal Telegraph-Cable Co.* (210 N. Y. 59, 72), which involved an alleged grossly negligent transmission of a telegram: " gross negligence is the commission or omission of an act or duty owing by one person to a second party which discloses a failure to exercise slight diligence. In other words, the act or omission must be of an aggravated character as distinguished from the failure to exercise ordinary care."

Certainly the authorities cited by the court in the *Weld* case for the conclusion reached do not bear out the conclusion that in gross negligence the act or omission must merely be of an aggravated character. In *Gurney* v. *Grand Trunk R. Co.* (37 N. Y. St. Repr. 155, 157; affd. on opinion below, 138 N. Y. 638), *e. g.* (a case involving loss of merchandise being transported by the defend-

ant railroad), the court said: " As contradistinguished from ordinary neglect, gross neglect means acts equivalent to *wilful* acts upon the part of the bailee by which the property is lost. Where he *wilfully* refuses to take any precaution for the purpose of saving or caring for the property, the bailee is guilty of gross neglect. It is *not* where he simply fails to use the ordinary care which a prudent person would exercise under the circumstances." (Italics mine.)

The court in *Cattaraugus Cutlery Co.* v. *B., R. & P. R. Co.* (24 App. Div. 267), involving the destruction of merchandise in the baggage room of a railroad station fire, also relied upon in the *Weld* case, adopts the definition above quoted; and in setting aside the verdict in favor of plaintiff as against the weight of the evidence, declared that the defendant was not " guilty of gross negligence or willful misconduct," thus determining the similarity of the terms used. Again, in another authority cited by the court in the *Weld* case for its conclusion (*Halsted* v. *Postal Telegraph-Cable Co.*, 193 N. Y. 293, 300), arising out of an alleged grossly negligent transmission of a telegram, GRAY, J., writing for a unanimous court, unequivocally indicated that gross negligence had, as an essential characteristic, willfulness. " However occurring, if by no wilful misconduct, a mere mistake, or error, in the transmission of a message would not warrant a jury in finding that there had been more than ordinary negligence."

If the conclusion reached in the *Weld* case as to the aggravated character of the negligence implies some intentional or willful act as the aggravation, then the conclusion is sustained by the authorities relied upon; otherwise not.

This idea of willfulness or recklessness has been adopted by text writers. " Gross negligence is the intentional failure to perform a manifest duty, in reckless disregard of the consequences, as affecting the life or property of another, or a thoughtless disregard of consequences without any attempt to avoid them. * * * It may consist of a degree of carelessness and inattention which proceeds in gross disregard of the rights of others, without involving any willful or intentional purpose of injuring them." (1 Thompson Comm. Neg. [2d ed.] § 20. See, also, 45 C. J. pp. 668–670, § 36; Bailey, Personal Injuries [2d ed.], vol. II, § 640.)

Whatever differences there are in the definitions in the cases above cited, it should be noted that none of them pertains to cases involving trusts or the exculpatory clauses contained in trust agreements. They deal with bailments, contracts of carriage, personal injuries and transmission of telegraphic messages. It may well be that the definitions of gross negligence applying to such

cases are and should be different (although that is seriously questionable) from the definition applied to trust agreements. In *Browning* v. *Fidelity Trust Co.* (250 Fed. 321; certiorari denied, 248 U. S. 564) the court pointed out that the term " gross negligence " is " used in the law in many connections and with many shades of meaning " and definitely limited its discussion to its meaning applied to the trust indenture it had *sub judice.*

Regardless of whether a valid distinction may be made in its application to different classes of cases, the term involves willfulness, or recklessness, or their equivalent, when applied to trust mortgages. From the recklessness of an act or omission there may be spelled out an intent and purpose to refrain from doing something that a person should have done. It is not necessarily an active participation in the default in duty that is contemplated by the definition. It is rather a reckless and intentional passivity, when in fact affirmative preventive action should have been taken, that more closely approaches the meaning of the term. As was said by the court in *Browning* v. *Fidelity Trust Co.* (*supra*, p. 325): " Negligence that is gross involves the additional and affirmative element of intent to do or wilfulness with which is done the negligent act. The essence of gross negligence may be gathered from familiar definitions. It is defined to be ' the intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another,' *McDonald* v. *Ry. Co.* (Tex. Civ. App.), 21 S. W. 774; *Schindler* v. *Ry. Co.*, 87 Mich. 400; 49 N. W. 670; ' such a gross want of care and regard for the rights of others as to justify the presumption of wilfulness and wantonness.' 2 Thomp. Neg. 1264."

When speaking of the exculpatory clause in a trust which relieves a trustee from certain liability but excepts gross negligence, The Restatement of the Law of Trusts states (§ 222, comment a): " although he is not liable for mere negligence, he is liable * * * if he acts or omits to act with reckless indifference as to the interest of the beneficiary."

It is clear from the trust indenture under consideration that something different from ordinary negligence is meant by the words " gross negligence," as used in section 5 of article XV of the indenture above quoted. Otherwise, the phrase is meaningless, since the exemption from liability on account of ordinary negligence is clear from the balance of the section. Gross negligence in this trust indenture, therefore, cannot be taken to mean only a great degree of negligence or numerous instances of negligence. The term must mean some middle ground between negligence and bad faith. I conclude that the meaning to be given to the expression

is that found in *Browning* v. *Fidelity Trust Company* (*supra*) as including a mental attitude of reckless and wanton disregard of the rights of others.

Taking up the contention of the plaintiffs — that the defendant was guilty of gross negligence in permitting valueless securities to be substituted — it must be pointed out in the first place that the trust indenture did not specify value as the criterion for determining whether the securities offered for substitution should be accepted. It might, of course, have made value the standard. It did not do so. It adopted a different standard, namely, earnings. It may be that value would have been a more satisfactory criterion from the point of view of protecting debenture holders. Earnings, especially as defined in the indenture, may fluctuate from year to year in degrees which have no relationship with intrinsic worth. Underlying security would be more important to debenture holders than the temporary earnings of any twelve-month period. But the trustee cannot be held to a contract different from the one actually adopted. Section 5 of article IX clearly indicates that the only standard set up for the guidance of the bank was " the amount of earnings applicable to debenture interest."

For the same reason, the fact that the files of the bank showed that these stocks were considered by its investment department as speculative cannot be conclusive under the language of the indenture. The test for substitution was not the comparative investment desirability but the earnings only.

With respect to the plaintiffs' contention that an investigation of the books of the National Electric Power Company and the National Public Service Corporation would have shown that the earnings certificate was false and that the stock was valueless, it is correctly urged by the defendant that the trust indenture did not impose upon the defendant any duty of investigating the truth or falsity of the earnings certificate. The form of the earnings certificate and its contents are all minutely detailed in section 4 of article I of the indenture. The sole duty of the defendant, under the indenture, was to see that the earnings certificate was prepared and executed in conformity with the provisions of the indenture. The indenture, by section 10 of article XV, authorized the trustee to rely upon the company's figures, and to accept the earnings certificate " as conclusive evidence of any fact or matter therein set forth."

The trust indenture did not impose any further obligation upon the defendant, unless the failure to investigate might itself be gross negligence in view of the other facts which were known or imputable to the defendant, relative to the stock proposed to

be substituted. The defendant did have the right to make an investigation at the expense of the obligor. This permissive examination seems to be restricted by section 10 of article XV of the indenture only to the books and records of the company. Assuming that the defendant should have made an examination of the books to ascertain the truth or falsity of the earnings certificate, what would the defendant have discovered if such investigation had been made?

The certificate was computed from the books of the corporation. The books and records of the National Public Service Corporation and its subsidiaries had been audited annually by well-known and reputable firms of accountants, and were kept in accordance with accepted accounting principles. The figures appearing on the earnings certificate were taken accurately from the books.

A great deal of testimony was adduced by the plaintiffs to prove that the amounts of depreciation and taxes set forth upon the books of the company were understated, and that an examination would have revealed it. The experts called by the plaintiffs also excluded from the asset side of the balance sheet certain items which are usually included therein in accordance with accepted accounting practice, on the ground that they were intangibles and, in fact, valueless. The purpose of this proof was to show that National Public Service Corporation had no actual surplus, and that, therefore, there could have been no earnings applicable to its class B common stock.

The question of the proper amount of depreciation to be allowed by utilities has always been a complicated and often an unsettled one. The plaintiffs' experts and the defendant's experts disagree as to the proper amount of depreciation to be allowed, and even as to the proper method of depreciation to be followed. Section 4 of article I, in discussing depreciation, provides that for the purpose of determining earnings there should be deducted from income, among other things, " actual expenditures for ordinary repairs and maintenance, and amounts expended or set aside for depreciation *as shown by the books of the respective companies, but not including any other charges or reserves for depreciation."* (Italics mine.) The defendant was entitled to rely on this language in the trust indenture, which provided that the amounts carried on the books of the respective companies should be the test for the amount of depreciation, as well as the method of depreciation. Even assuming that the plaintiffs' experts were technically correct and the defendant's experts incorrect, the very fact that there is this division of technical opinion would be sufficient to absolve the bank from the duty of making its own decision as to the proper

amount of depreciation, especially since the trust indenture contains the provision it does with respect to depreciation. The bank could not have been called upon, in the face of the terms of the indenture, to decide a much mooted question of depreciation, and, at its peril, to determine whether or not the depreciation was understated. With this conclusion, it becomes unnecessary to analyze in further detail the testimony of the plaintiffs' experts as to the propriety of the depreciation actually taken.

The same result is reached with respect to the plaintiffs' claim that the amount of income taxes was understated. The tax experts are not in agreement on this question. In essence, the problem is one of law rather than of fact. It is not necessary in this controversy to attempt to decide that question of law. It is sufficient that the question is one of considerable doubt. Where such doubt exists, it cannot be said to be the duty of the trustee to determine that question at its own risk, in view of the language of the indenture in connection with the earnings certificate presented to it.

The plaintiffs' expert, Mr. Gough, testified that " before we could intelligibly interpret the earnings statement it was necessary for us to study the corporation's balance sheets. * * * Many of the items therein are related to income, such as assets to be written off or diminished by charges against income * * * etc." Various intangibles included in balance sheets as assets were thereupon eliminated by him in reaching his conclusion as to the falsity of the earnings certificate. In arriving at such conclusions, however, the balance sheets of the corporation were treated as on a liquidating basis; that is, analysis was made of what the actual cash value of many of the assets would be if they had to be converted into cash. While it is true that many of the intangibles in fact had no value on liquidation of assets, still they were carried as assets in conceded accordance with standard utility accounting practices. Since the corporation was a going concern on December 21, 1931, the defendant obviously had the right to rely upon the fact that the books of the corporation were being kept in accordance with standard practices, and that, viewed in such light, the various items were to be accorded their proper accounting values.

The defendant was not bound by the indenture to consider the various assets from the point of view of liquidation value. In determining this controversy we must consider the acts of the defendant in the light of the circumstances and the facts as they existed on the date of substitution and not those which occurred or became known later. Hindsight is not helpful in fixing responsibility. The conduct of the trustee must be measured by what was before it on the date when the acts complained of were committed.

With respect to the contention of the plaintiffs that Makepeace knew that the common stock of the corporation had no value and that the earnings certificate was false, it becomes necessary to determine: *First*, whether Makepeace's knowledge acquired by him as a director of the two companies may be imputed to the bank, and *second*, what that knowledge was.

In determining the question of imputability it would be most unjust to these plaintiffs to consider the great size of the defendant as a factor in limiting its liability. Makepeace was one of the senior officers of the defendant and not a mere clerk. The bank was employed as a whole to act as a trustee under the indenture. The indenture did not provide merely that the trust department of the bank should be the trustee. When the obligor selected the bank to act as trustee, it was unquestionably influenced by the size and financial strength of the bank. Similarly, purchasers of bonds must have been influenced by the fact that the trustee of the indenture was a huge institution like the Chase National Bank. As was stated by Mr. Posner in 42 Harvard Law Review (p. 199), " a growing reliance has come to be placed by investors upon the trustee, usually a banking corporation, so that the standing of the trustee has become, in a measure, a certificate of the mortgagor's standing, and serves to ' encourage the sale of securities ' and give ' tone to the obligation.' "

The same author also states (at p. 239), " the trustee's reputation and command of public confidence are definite factors in fostering the sale of securities. As early as 1881, it was stated that, ' the salability of the bonds depends in no inconsiderable degree upon the character of the persons who are selected to manage the trust. If they are of well known integrity and pecuniary ability, the bonds are more readily sold than if this were not the case. It is natural that it should be so.' (From the opinion in *Merrill* v. *Farmers' Loan & Trust Co.*, 24 Hun, 297, 299.) An investor today places quite as much dependence upon the standing of the trustee as he did when the court made this declaration."

Of course, the various limitations of liability with which corporate trustees have been able to cloak themselves have had the unfortunate result that the size and financial strength of the trustee has afforded only slight protection. But it would be a very unwarranted limitation of liability to say that in determining the liability of the trustee the court should consider only the acts and knowledge of the particular trust officer or clerk who made the substitution. In this case, so far as the record discloses, only one man in the bank handled this transaction. According to his own testimony, no one else at the bank knew that the substitution

was being made. He himself was unfamiliar with any of the affairs of National Public Service Corporation or National Electric Power Company. The defendant's contention is that this comparatively subordinate officer should alone be taken into consideration in determining whether or not the bank was guilty of a violation of its duty, because Makepeace and the other officers whose connection with these matters has been shown did not have a duty to report their knowledge to the trust department. The effect of this is to urge that instead of the Chase National Bank being the trustee, Mr. Buckley, the trust officer, was the trustee. The very statement of this proposition shows how unjust and unfair it would be to certificate holders who unquestionably believe that the entire institution was, in theory at least, looking out for their interests. The very size of the bank, which concededly is one of its chief recommendations as a trustee, inspiring confidence in the issue, is now being urged by the defendant as a reason·for not imputing the knowledge of its various officers in charge of its component parts, to the bank itself.

Many cases have been cited to the court dealing with the imputability of knowledge on the part of a corporate officer to the corporation itself in various circumstances. The rules therein stated should not be made applicable to a case like this, where a corporation has been selected to act in a fiduciary capacity. At least the debenture holders should be entitled to such protection as the indenture gives them. The indenture states that the bank is the trustee, and not Mr. Buckley.

Therefore, in the conclusions here reached, I have taken as the knowledge of the defendant on the date of the substitution, the sum total of all the knowledge and information which its various officers themselves had, as officers, and also the material which was contained in the various credit and investment files of the bank on that date. Whatever knowledge might have been in the possession of officers of the bank, in their individual capacities rather than as officers, should of course not be considered. Nor should every paper or letter which came to the attention of subordinate clerks. However, the bank is made up of all its officers, its board, and its files. When the bank was retained and paid as a corporate trustee, when it gave its name to the trust indenture itself, all of these things were included. It was the bank, and not Mr. Buckley, who was trustee, and for that reason all of the component parts of the bank must be taken together. (See *Chase National Bank* v. *Sweezy*, 281 N. Y. Supp. 487; affd., 236 App. Div. 835; affd., 261 N. Y. 710, where the banking department of this same defendant, acting as trustee, was charged with knowledge of the terms of the trust indenture under which it was acting.)

As was said by the court in *Browning* v. *Fidelity Trust Co.* (*supra*, p. 324): " On the bare question of knowledge we agree with the learned district judge that the trustee cannot thus divide itself into units or parts and cannot escape liability, when based upon knowledge, because one of its parts was without it while another possessed it. Clearly the knowledge of the paying teller that default had been made in interest payments was knowledge chargeable to the corporation itself."

It is true that this conclusion imposes quite a task on large corporate trustees. But so long as they are willing to contract for their services as experienced financial institutions, they should be held to their contract in the same way as they seek refuge in their contract when exemption is sought by them from duties of active vigilance.

In view of the fact that the knowledge which Mr. Makepeace had acquired as a director of National Electric Power Company and National Public Service Corporation is to be attributed to the defendant, it is essential to determine the extent of his knowledge of the value of the substituted collateral and of the truth or falsity of the earnings certificate.

Here, too, the provisions of the trust indenture govern in determining whether the trustee's contractual duty was fulfilled. The bank had the contractual right to accept the certificates at their face value. But the question still remains as to whether gross negligence existed in permitting the substitution. Even though value was not the criterion set up in the trust indenture for propriety of substitution, still, if it can be said that Makepeace knew that there was no value at all to the common stock of National Public Service Corporation, and if the knowledge is imputed to the defendant, an inference might well be drawn of gross negligence in permitting the substitution of such patently and obviously worthless collateral.

For that reason, evidence was taken as to what the books of the corporation disclosed as to value and what Makepeace knew about them. Makepeace, of course, had first-hand knowledge of the balance sheets, consolidated and otherwise, of the companies of which he was a director. However, Makepeace also was entitled to consider the corporation a going concern rather than in liquidation. As a going concern, it was entitled to keep its books in accordance with the accepted standards of accounting practices for comparable companies. The conclusions hereinbefore reached as to what would have been disclosed by an investigation by the bank of the books and records of the company, are, therefore, equally applicable to the knowledge which Makepeace had of such books and records.

Mr. Makepeace knew of the prospectus issued in conjunction with the sale of debentures to the public, including these plaintiffs. He, likewise, knew of the inconsistent position of the bank as a creditor of the National Electric Power Company, and a trustee for its debenture holders. It was not shown by the evidence that Mr. Makepeace knew of the actual substitution of securities until December twenty-ninth, after the substitution had taken place. He knew that National Electric Power Company was having its difficulties in securing public financing to refund its bank loans and that all of the responsible officers of the National Electric Power system were indebted to his bank in sums exceeding the value of the collateral securing the bank.

That Makepeace was entitled to regard the companies as going concerns rather than as in liquidation, and that he did, in fact, so regard them are borne out by the fact that on November 10, 1931, he personally invested $2,900 in the purchase of $5,000 of the face amount of National Public Service Corporation debentures. He testified that such purchase was made by him on the basis of the earnings of National Public Service Corporation. He continued to hold such debentures until February or March of 1932. He also testified that he had no reason to assume that the financial stability of National Electric Power Company or National Public Service Corporation was in danger during the year 1931, and that he considered the loan of National Electric Power Company in good shape on December 29, 1931.

The large acquisition program which is relied upon by the trustee as the reason for the withdrawal of the securities on December 21, 1931, was known to Makepeace. He testified that the shortage of cash in National Public Service Corporation in December, 1931, was caused by this program; that it had temporarily financed such acquisition through bank loans, and that National Public Service Corporation had been reduced to the necessity of borrowing on the life insurance policies of its officers for the purpose of meeting year-end requirements mainly by reason of this unfavorable cash position. He knew that the current liabilities exceeded the current assets of these companies, and that the companies had pledged practically every bit of free collateral for bank loans. He knew of the past-due, under-collateralized notes which the defendant held from the responsible officers of the Insull system. On the other hand, Makepeace had been voting for dividends through 1931 on treasurer's certificates showing a continuing surplus available in National Public Service Corporation for such dividends. He knew that the book earnings for class A and class B common stocks for the twelve months'

period ended November 30, 1931, exceeded the. earnings for the comparable previous year by $500,000; that the book surplus figure as of December 1, 1931, was higher than a year previous; that as a result of an expansion program the fixed capital of National Public Service Corporation had increased during 1931, as had the number of communities and people served. He knew that these books containing these figures were audited annually by reputable accountants, and were kept in accordance with accredited accounting practices.

On December 16, 1931, the defendant joined with other banks holding collateral of Corporation Securities Company against loans, in an agreement which was tantamount to a " stand-still " or extension agreement for four months. While the defendant was a creditor of Corporation Securities Company in only a small amount as compared with the other banks included in the agreement, and was not the moving cause for the agreement, the very making of the agreement gave the defendant notice of the precarious condition of the top holding companies of the Insull system.

Under such circumstances, therefore, have the plaintiffs' contentions of gross negligence on the part of the defendant been sustained, in spite of the various exculpatory clauses with which this indenture fairly bristles?

It is clear that if it were not for the terms of the indenture, the defendant could not escape the conclusion that it was negligent towards its bondholders. If the relationship between this so-called trustee and these plaintiffs were the ordinary common-law fiduciary relationship, and if the trust instrument did not exempt the defendant from every duty of making reasonable inquiry, the acts of the trustee would be a distinct violation of the well-recognized obligations arising from such relationship. It is elementary that a trustee owes to its fiduciary at least the duty of exercising the same care and prudence that a reasonable man would exercise with respect to his own property. Without going into all of the details of the evidence, the conclusion is irresistible that, apart from the general and specific exculpatory clauses, the defendant was guilty of lack of reasonable care in accepting these substituted securities without further investigation, with all of the knowledge which is attributable to it through its vice-president, Makepeace, and through its other officers and investment files. The fact that the substituted securities were removed so many times from the actual earnings of the operating companies, whereas the withdrawn securities were those of operating companies themselves; the fact that the debentures of National Public Service Corporation were themselves selling as low as thirty-six, or a little over one-

third of par; the fact that the country was then in the midst of a financial debacle; the precipitous decline in utility earnings; the fact that so many of the assets carried on the balance sheets would have no value on liquidation; the decline in the bank balances of these corporations; the fact that the bank's investment and credit files showed that the common stock of National Public Service Corporation was a highly speculative investment, and, indeed, that the gold debentures of such corporation " occupy a speculative position and must be regarded as undesirable for conservative investment purposes; " the execution by the defendant of the so-called " stand-still " agreement of December 16, 1931, which extended the loans of Corporation Securities Company; the knowledge of the close connection and inter-dependence financially between said Corporation Securities Company and the other holding companies of the Insull system; the fact that the cash position of National Public Service Corporation was so low that it had to borrow money on the lives of its officers; the more precipitous decline in the value of the securities of holding companies as compared with those of operating companies; the inconsistent position of the bank as a creditor of the National Electric Power Company — the total of all of these, and other facts in evidence, it can fairly be concluded, would have deterred a reasonably careful person from giving up the securities of the three operating companies for those of more doubtful value of the holding company, if he were managing his own property, or if he were a common-law trustee not protected by the clauses of this indenture.

With this trust indenture and the exculpatory clauses thereof, however, a different picture is presented. Similar exculpatory clauses have been upheld time and again as valid and not contrary to the public policy of this State. (*Benton* v. *Safe Deposit Bank of Pottsville*, 255 N. Y. 260; *Green* v. *Title Guarantee & Trust Co.*, 223 App. Div. 12; affd., 248 N. Y. 627; *Hunsberger* v. *Guaranty Trust Co.*, 164 App. Div. 740; affd., 218 N. Y. 742; *Greene* v. *Continental Bank & Trust Co.*, 267 id. 519.) In the *Benton* case the duty of the trustee was held to be strictly measured and limited by the agreements contained in the indenture. The court referred to the slight financial remuneration which the trustee bank received in the transaction, and came to the conclusion that " the bank was merely prudent and cautious in limiting its liability and defining its duties."

The defendant here not only generally restricted its liability to gross negligence and bad faith, but practically in every way and at every turn specifically limited and prescribed its duties, obligations and responsibilities. For example, section 9 of article XV,

above quoted, protected the defendant in acting upon any certificate or other paper or document believed by it to be genuine. The same section gave it protection in respect of any action taken by it pursuant to the opinion of counsel. The succeeding section provided that certificates accompanying applications for release of securities " may be received by the trustee as conclusive evidence of any fact or matter therein set forth * * * not only in respect of the facts, but also in respect of the opinions therein set forth." The same section relieved the trustee in specific terms from any duty " to make any further investigation into the matters stated in any such resolution, certificate, etc."

The defendant in the case at bar is protected by the trust agreement from any liability in relying, as he did, upon the certificates furnished. As pointed out in 42 Harvard Law Review, 198, at page 215, in discussing the ordinary clauses in trust agreements for substitution of security, " such releases and exchanges are usually regulated by reports and certificates of officers, appraisers, and the like, and generally speaking, afford full protection to the trustee who acts thereon in good faith, even though loss be occasioned by the release."

Of course, a trustee's power to release or substitute collateral can arise only from the terms of the indenture itself. Apart from the authority contained therein, a trustee concededly has no right to release or substitute any collateral. (*Colorado & Southern R. Co.* v. *Blair*, 214 N. Y. 497; *Conover* v. *Guarantee Trust Company*, 88 N. J. Eq. 450; 102 Atl. 844; affd., 89 N. J. Eq. 584; 106 Atl. 890.) This trust indenture clearly permitted the obligor to substitute collateral upon certain specified terms and conditions.

Can there be implied here, in spite of these exculpatory clauses, a common-law trust relationship, so that the usual legal consequences thereof will attach independently of the provisions of the trust indenture? The courts of some States have made such implication, and have held the trustee to a fiduciary's duty in spite of the various verbal devices used to free it from such responsibility. (*Marshall & Ilsley Bank* v. *Guaranty Investment Co.*, 213 Wis. 415, 422, 423; 250 N. W. 862; *State* v. *Comer*, 176 Wash. 257, 263, 264; 28 P. [2d 1027; 33 Columbia Law Review, 97, 98, note 3. See 42 Harvard Law Review 198, 244.) The courts of other States have taken the opposite position. (See 33 Columbia Law Review, 97, 98, and cases cited in note 4 thereof.)

Irrespective of holdings or tendencies in other jurisdictions, it is now the well-settled doctrine of this State that so long as the trustee does not step beyond the provisions of the indenture itself, its liability is measured, not by the ordinary relationship of trustee

and *cestui*, but by the expressed agreement between the trustee and the obligor of the trust mortgage. Where the terms of the indenture are clear, no obligations or duties in conflict with them will be implied.

The case of *Patterson* v. *Guardian Trust Co.* (144 App. Div. 863, 867 [Third Dept. 1911), which did seek to imply as a duty of the trustee " the care and diligence which would naturally be expected of an intelligent person acting in like circumstances to protect his own mortgage," has not been followed by later judicial authority in New York.

In *Green* v. *Title Guarantee & Trust Co.* (*supra*, at p. 15) the court definitely stated that " the duties which defendant as trustee owed to the bondholders * * * are fixed and determined by the provisions of the mortgage, and defendant could not be held liable to a bondholder for failure to perform a duty unless it had agreed to perform it." In that case the negligence claimed was the failure on the part of the trustee to demand a certain instrument from the obligor. The obligor had agreed to furnish the instrument, but the trustee was specifically relieved by the indenture from any obligation to procure the instrument. The court said (p. 16): " In the face of this exemption provision no duty could be implied on the part of the trustee to procure any additional instrument or further assurance."

It is true that in an earlier case arising out of the issuance and certification of bonds by the trustee, the court imposed some duties upon the trustee by implication arising from the trust relationship rather than the trust indenture itself. (*Rhinelander* v. *Farmers Loan & Trust Co.*, 172 N. Y. 519 [1902].) In a later case, however (1930) (*Doyle* v. *Chatham & Phenix Nat. Bank*, 253 N. Y. 369, 375), the *Rhinelander* case was treated as one where the certification had been made *in contravention of the trust agreement* itself which required " the making by the directors of the mortgagor of a written instrument setting forth the purposes of the issue." In fact, the *Doyle* case specifically repudiated the theory of implied obligations, pointing out that at the time of certification there can be no fiduciary relationship because there are no *cestuis* actually in existence at the time. The court said (p. 376): " Notwithstanding these expressions, [in *Rhinelander* v. *Farmers Loan & Trust Co.*, *supra*] it is obvious that a trustee, in wrongfully certifying bonds to prospective takers, in order that they may become *cestui que trust*, cannot, at that moment and before the relationship is established, have violated a trust duty owed to them. Manifestly this is true: ' There is no trust or other relation between a trustee

and a stranger about to deal with a *cestui que trust.'* " (See 5 St. Johns Law Review, 108, for a discussion of both of these cases.) In both of them the trustee actually exceeded the authority given to it by the trust indenture in respect to certification. In order to sustain liability toward bondholders who occupied no contractual or fiduciary relationship with the trustee at the time of certification, it became necessary for the court to invoke the doctrine of negligent representation enunciated in *Glanzer* v. *Shepard* (233 N. Y. 236) and similar cases. (*Doyle* v. *Chatham & Phenix Nat. Bank, supra,* p. 377.)

The dictum in *Green* v. *Title Guarantee & Trust Co.* (*supra*), to the effect that a trustee under a corporate chattel mortgage is under an implied duty to refile the mortgage, and that he cannot evade the liability for failure to do so by an exculpatory clause to that effect in the indenture, is contrary to the general rule of exoneration of trustees in this State under similar indentures.

In the case of *Harvey* v. *Guaranty Trust Co.* (134 Misc. 417 [1929]; affd., no opinion, 229 App. Div. 774; affd., 256 N. Y. 526), although there is some language in the opinion below which expresses a different view, the facts show that the trustee exceeded his authority in releasing the security while the plaintiff's bonds were still outstanding, without requiring the presentation of all the bonds and coupons previously authenticated or the deposit of moneys sufficient to redeem those not presented. According to the prevailing New York view, therefore, the trustee was held liable. (See 33 Columbia Law Review, 97, 102, for a discussion of this " beyond the scope of powers " doctrine in New York.)

Therefore, the rule of trustee and *cestui* is not the one to be applied here, either by agreement or implication. The question is, therefore, whether gross negligence as hereinabove defined has been committed under the terms of the indenture.

I am constrained to conclude that the defendant was not guilty of that kind of gross negligence, in view of the fact that everything which it did was specifically permitted, and that everything which it failed to do was specifically excused, by the express provisions of the trust indenture itself. Although the defendant was negligent, as judged by the standards of care imposed upon a common-law trustee, it cannot be said that under the language of the indenture it was guilty of willful passivity or of reckless disregard of the rights of the debenture holders when, in fact, it complied with every detail of its contractual duty.

Nor can it be said that Makepeace's knowledge, imputed to the defendant, brands its conduct as grossly negligent as herein defined. A consideration of the facts before him does not lead

to the conclusion that the substitution was permitted with willful or reckless disregard of the rights of the bondholders, when the various permissive and exculpatory provisions of the indenture are borne in mind.

The facts of this case show, perhaps as clearly as can be imagined, how utterly unjust to the investing public is the modern trust indenture. Prospective investors are unquestionably induced to purchase debentures, to a great extent, by the name and prestige of the trustee, which are capitalized by the obligor seeking financing, in order to sell its securities. It is safe to assume that many investors in these debentures of National Electric Power Company were led to purchase them, in large measure, by the fact that the Chase National Bank, or its predecessor, with all of its power and prestige in the financial community, was named as trustee. While it is true that our courts have, unrealistically, held purchasers to a knowledge of the terms of the indenture, the fact cannot be avoided that seldom, if ever, is the indenture read by such purchasers. It is, indeed, doubtful whether they understand that they should read it, or whether reading it would lead to comprehension of its significance. Reliance is placed almost completely upon the belief that the experience, power, financial acumen and integrity of the trustee will serve as a protection. Nor does it appear that repeated warnings by the courts will cause more persons to read indentures in the future than in the past. The untrained investor unquestionably depends upon the great financial institution named as trustee to supply the skill and the watchfulness and the prudence and the experience which he himself lacks. The cruel fact is that not only is the trustee not required to exercise that greater skill and watchfulness and prudence and skill which it has, but it is even absolved from exercising merely the ordinary care which a single individual should exercise as to his own affairs.

Billions of dollars have been invested on the strength of indentures such as the one involved in this case. This defendant alone, at the time of the substitution, was acting as trustee under 850 similar indentures, totalling about $5,000,000,000.

In such indentures the use of the word "trustee" is clearly a misnomer. The corporate trustee has very little in common with the ordinary trustee, as we generally understand the fiduciary relationship. The ordinary trustee is supposed to represent the interests of the beneficiary alone. The courts impose upon him an undivided loyalty to the *cestui que trust*. So strict is the rule of undivided loyalty to the beneficiary that the mere fact that a trustee has an interest inconsistent with the interest of his

*cestui*, casts upon him the burdens of explanation and justification. (*Munson* v. *Syracuse, G. & C. R. R. Co.*, 103 N. Y. 58; *Globe Woolen Co.* v. *Utica Gas & Elec. Co.*, 224 id. 483.) The trustee under a corporate indenture, on the other hand, has his rights and duties defined, not by the fiduciary relationship, but exclusively by the terms of the agreement. His status is more that of a stakeholder than one of a trustee. Indeed in the earlier indentures the documents were rather in the form of escrow agreements and no duties were assigned to the trustee. (See 33 Columbia Law Review, 97, 99.) Far from refraining from occupying inconsistent positions, corporate trustees have affirmatively and deliberately assumed them to an increasing degree. Corporate trustees have come to act as promoters, underwriters, bankers, financial advisers, bondholders and creditors of companies whose debenture holders they have been selected to protect. (42 Harvard Law Review, 198, 226.)

It is becoming increasingly clear that these indentures, though legally permissible, have all the potentialities of fraud upon innocent investors. A recent study by the Legislature of the State of New York has revealed how widespread has been the damage caused to investors by such indentures, even in the restricted field of real estate, and how impossible it has been to secure relief in the courts. (See Report of Legislative Investigating Committee to Investigate Bondholders' Committees, etc. [Legis. Doc. No. 66, 1936, pp. 18 *et seq.*].)

This indenture was particularly vicious. It permitted the substitution of practically all the collateral, on the bare statement of officers of the obligor as to earnings. It made unnecessary any check-up by an impartial agency. It rendered unnecessary any consideration on the part of the so-called trustee to the comparative value and soundness of the substituted collateral. It placed in the hands of the obligor the power to wipe out completely the security behind its debentures. No check or restraint of any appreciable force was provided. The clauses permitting substitution are so astutely tucked away that the average layman would have the greatest difficulty in discovering them. Not only the average layman, but seasoned financial experts like those who publish Moody's Manual apparently overlooked the power of substitution, for until after the collapse of the system Moody's Manual, in describing these bonds and the security behind them, never mentioned the power or possibility of substitution of collateral.

The defendant contends, as do financial institutions generally, that the fees usually received for acting as " trustees " under these indentures are not adequate if the duties of an ordinary fiduciary

are to be assumed. That may be true. Conversely the fee of $1,100 per year in this case was grotesquely exorbitant for the negligible services performed and responsibility undertaken by the defendant. The defendant did not earn its fee either in work or in risk. It would be far better for the bondholders to pay a much larger compensation to the trustee, and be able to insist upon the usual vigilance of a fiduciary. The trustee need not become an insurer any more than, for example, a testamentary trustee. But the trustee should be made to live up to the responsibility which nearly every purchaser assumes it has, and which it represents to the public as having undertaken, in a sense, by the very advertisement of the designation " trustee."

Such change can come in this State only through action by the Legislature. Trustees have accepted duties under these indentures, slight as they are, relying upon judicial precedents absolving them from exercising ordinary care, and permitting them to insert practically unlimited exculpatory clauses. The rules which have been laid down by the courts can obviously not be altered now by the courts in justice to trust agreements which have been made in reliance upon them. The entire system, however, should be changed by legislation, so as to provide more adequate compensation to the trustee, and the imposition of a duty of active vigilance akin to that placed upon ordinary fiduciaries. Legislation to such end, applicable only to real estate trust mortgages, however, is now pending before the Legislature. (Assem. Intro. No. 1880, Print. No. 2779, by Mr. Streit.) Particularly, the right of release or substitution of collateral should be carefully circumscribed. If the trustee itself is not required to assume any duty of vigilance with respect thereto, certificates should be required of disinterested appraisal experts, not only as to earnings but as to value, and, indeed, as to every other item which banking experts consider important in measuring the desirability of collateral.

I am reluctantly constrained to conclude that the defendant has successfully exempted itself from liability in this sad picture of high finance. For the inexcusable terms of the indenture, the trustee cannot be held accountable. It performed in full the negligible duty which was imposed upon it by the indenture. It did nothing more; but, having done that, it is absolved under the law.

During the course of this trial Reid, the president of National Electric Power Company and of National Public Service Corporation, testified to the startling conduct of Martin Insull and his colleagues in foisting the personal under-collateralized loans of various officers of the Insull system upon Electric Management

and Engineering Corporation, one of the subsidiaries of the system. National Electric Power Company and National Public Service Corporation owned this subsidiary. On the basis of the testimony before me, I assume that the trustee in bankruptcy of these two companies is proceeding civilly to recover for the damage done to Electric Management and Engineering Corporation by these transactions.

The court desires to commend counsel for the plaintiffs, and his associates, for the careful and orderly preparation and present-ment of this difficult and complicated case, which had to be built up from the not always co-operative lips and files of the trustee itself. Judgment for defendant, without costs. Settle find-ings and conclusions by April 29, 1936.